Eugene I. PITTS *v.* STATE of Arkansas

CR 80-40                                              617 S.W. 2d 849

Supreme Court of Arkansas
Opinion delivered June 29, 1981

*William R. Simpson, Jr.*, Public Defender, and *Gene Worsham*, for appellant.

*Steve Clark*, Atty. Gen., by: *Jack W. Dickerson*, Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. Pitts was convicted of the capital felony murder of Dr. Bernard Jones, committed in the course of kidnapping, and was sentenced to life imprisonment without parole. For reversal he questions two rulings about the admissibility of evidence and, secondarily, the sufficiency of the evidence to support the verdict.

Before narrating some of the testimony we should explain that the appellant questions the credibility of Dr. Jones's widow, Benita Jones, who identified Gene Pitts as the person who kidnaped her husband, and also relies heavily upon the testimony of Linda Stanley, who said that the Toyota Land Cruiser in which the decedent's body was

found the next morning was parked near her house at 6:07 p.m. In our opinion both those matters presented issues of credibility for the jury.

The three principals, Pitts and the Joneses, were all black persons. Mrs. Jones testified that she first knew Pitts for about a year and a half in the law school at Fayetteville. She said there were only from 15 to 20 black students, who went to the same places together and got to know each other. She had a car, and she and Pitts traveled in it together to Little Rock once or twice.

Benita married Bernard Jones, a veterinarian, in 1977. In January, 1978, Pitts, not concealing his identity, began to harass her with phone calls to the Legal Aid, where she worked. He seemed to just want to talk to her, but he also said she would have to belong to him and she would have to get rid of that "Goddamn nigger" she was married to. On Valentine's Day she received a dozen roses from a flower shop, with no identification of the sender. After the murder a search of Pitts's home produced a paid receipt from that shop for a dozen roses to be sent to Benita Terry at the Legal Aid. Also on Valentine's Day Dr. Jones received in the mail a package containing a bullet with "Bernard" scratched on it. A handwriting expert testified that it was highly probable that Pitts wrote the address on the package. Dr. and Mrs. Jones went to the prosecuting attorney's office and soon obtained an injunction prohibiting Pitts and the Joneses from harassing one another. Mrs. Jones saw Pitts in the course of that court proceeding.

The murder occurred on the evening of January 22, 1979. Dr. Jones left his office at about 5:40, dropped off an employee at about 5:50, and evidently went home. Mrs. Jones got home at about 6:00 and parked her car in the driveway next to her husband's Toyota Land Cruiser. These times are so well established by independent testimony that there is no doubt about their substantial accuracy.

The Jones house, in the Lakewood area of North Little Rock, appeared to be dark when Mrs. Jones got home. As she went in the open front door an intruder with a gun stepped

from behind the door, stopped her, and made her go up some steps to a hallway, where the light was on. The intruder wore a beanie cap, pulled down, nothing over his eyes, and some sort of mask that concealed his nose and mouth. Dr. Jones was lying face down in the hallway, with his hands and feet tied and something tied around his head. In the hallway Christmas presents, checks, and other articles were scattered about on the floor.

The intruder refused her request to go to the bathroom and ordered her to lie down. She testified: "By this time I knew who he was and I said, 'It's you, isn't it, Gene?' And he said, 'Don't call me no more Goddamn names and just shut up and lie down.'" After she lay down Pitts tied her hands and feet, put a scarf in her mouth, gagged her, and tied something over her eyes. She testified that before she was tied up, Pitts said to her husband, "You lied, didn't you, Doc?" The witness continued: "That was when we were walking down the hall. He said: 'You lied, didn't you, Doc? You told me she had a class.' Then I said, 'No, no, he didn't lie. I had a class but I had to come home and get something.' He said, 'Doc, you're going to have to pay for that. You lied.'"

Mrs. Jones testified that after she was bound and blindfolded she could hear Pitts apparently taking things out of the front door. (Later she found that two small TV sets, three watches, a rifle, a shotgun, two cameras, and money were taken. The items were found in the Land Cruiser the next day.) She testified that before Pitts left with her husband, her husband said he could walk and also identified some keys. After the two men left she heard the Toyota Land Cruiser start up. That was 15 or 20 minutes after she got home, which would be about 6:15 or 6:20 p.m.

After Pitts left with her husband Mrs. Jones tried to leave her house, fearing that Pitts would return. Her departure took some time. She got the blindfold down by rubbing her face on the carpet. She also loosened the gag with her tongue. With her hands tied behind her back she was unable to free her feet with a butcher knife on the kitchen floor. She got outside by pushing a little sliding latch with her nose. She "scooted" across the grass to a gate

to the neighbors' yard. The lock on the gate didn't work, and someone had removed the string the gate had been tied with. She pushed the gate open and reached the home of her neighbors, who let her in and untied her hands and feet. The neighbors testified that Mrs. Jones's hands were tied behind her back, her feet were tied, and she was partly gagged when she got to their house.

Mrs. Jones called the police, who recorded the time as 6:53. The police tape of the call shows that she said Gene Pitts had tied up her and her husband and had left with her husband in a Toyota Land Cruiser. Officer Montgomery arrived within a few minutes. There was evidence that the intruder had entered the Jones house through a kitchen window and had ransacked the house. Pitts's fingerprints were not found in the house; Mrs. Jones testified he was wearing gloves. She was positive in her identification of Pitts as the intruder.

Pitts was picked up at about 9:30 p.m. After having been warned of his rights he said that he had been trying to collect rent for his employer. The police asked for some addresses so they could interview the people, but Pitts said there had been so many that he didn't know any specific address. He did not testify at the trial.

The next morning the Land Cruiser was reported to the police as being parked on Arlington Drive, also in the Lakewood area. Dr. Jones's body was in a sitting position on the passenger side. He had been shot once in the side of the head and three times in the back of the head. His body was still tied up.

Dr. Jones's clothing was sent to the FBI laboratory for examination. An expert witness, Mike Malone, testified that he found several Caucasian hairs and a brown Negroid hair on the clothing. The Negroid hair, when examined with a microscope, had 20 different characteristics. Sample specimens of Pitts's hair had exactly the same 20 characteristics. Malone testified that as part of a test to qualify as an FBI examiner he was given 50 hairs from 50 different persons. He was also given another 50 hairs from the same persons, but they were all mixed up. He passed the test by matching all 50 pairs correctly, with no mistakes. He said that in his nine years' experience the only way he had seen hairs match the way they did in this instance was when in fact they came

from the same person. He testified that his identification was not absolutely positive, like a fingerprint. The jury, however, could certainly have relied upon it in returning a verdict of guilty.

The time discrepancy argued by the appellant is not really serious when the proof is considered as a whole. Mrs. Jones's testimony puts the departure of Dr. Jones and Pitts in the Land Cruiser at 6:15 or 6:20. Linda Stanley testified that she turned into her driveway on Arlington Drive at 6:07 p.m. by her car clock. As she turned, her headlights shone on a Land Cruiser about a car length away, parked in front of the house next door. She saw two men standing by the vehicle who made an effort to duck away and conceal themselves. She had the impression they were white people, but she did not see their faces and was not certain. She said she may have thought they were white because it is an all-white neighborhood.

Mrs. Stanley had been with a woman friend who was going to meet her to go out to dinner. The friend drove up "right behind me." When Mrs. Stanley got in her house she found she needed milk and had to go to Skaggs to get it, about two minutes away. She and the friend went to Skaggs and got the milk. The cash register receipt fixed the time as 6:35.

Mrs. Stanley had not mentioned the time of her arrival, 6:07, in her written statements, but at the suggestion of the police and at the request of the defense she submitted to hypnosis, a deputy prosecutor being present. Under hypnosis she remembered the time as 6:07; that, she said, was where the 6:07 time came from. There is no testimony about the reliability of a hypnotically stimulated memory.

The jury could readily have disregarded Mrs. Stanley's timing, in view of other testimony. Mark Musgrave, then aged 15, testified he lived across the street from Mrs. Stanley. At about 6:30 he was standing at the window of his house, looking for a friend who was to pick him up between 6:30 and 7:00. He was interested in cars and especially liked Land Cruisers. He saw the Land Cruiser drive up and park at about 6:30. Either one or two men got out and ran past Mrs. Stanley's house toward a field behind it. He was under the impression the man or men were white, but it was dark and raining. He was not sure. He knew Mrs. Stanley. She pulled

up about five or ten seconds after the Land Cruiser arrived. About a minute later another lady pulled up and went into Mrs. Stanley's house. He then left himself and did not see them leave.

Mark also testified that when the Land Cruiser arrived he called his mother from the kitchen to see it. He told her it was the kind of car he wanted. His mother testified to the same effect. She also said that the Mary Tyler Moore show on TV came on at 6:30 while she and Mark were discussing the Land Cruiser. Thus Mark and his mother corroborated Mrs. Stanley's testimony except as to the arrival time of the Land Cruiser, which they put at just before 6:30. Inasmuch as Mrs. Stanley's timing is essentially contrary to all the other pertinent testimony, the jury was not required to accept it.

In summary, the state's proof established Pitts's motive for murdering Dr. Jones and his various threats to do so. Mrs. Jones's statements to the police and her testimony at the trial had minor inconsistencies, but there was no variance so great as to weaken her positive identification of Pitts as the intruder in her home. The FBI testimony about the hair definitely puts Pitts in contact with Dr. Jones. Pitts left the Jones house in the Land Cruiser with Dr. Jones and the stolen articles. The body and articles were in the vehicle the next morning. Mrs. Stanley's timing of the arrival of the Land Cruiser was contradicted by Mark Musgrave and his mother. Only about three hours after the murder Pitts was unable to account for his earlier whereabouts. We find an abundance of substantial proof to support the verdict.

Second, it is argued that defense counsel should have been permitted to cross examine Dr. Malak, the medical examiner who performed the autopsy on Dr. Jones's body, about the finding of a few sperm in the anal area. Dr. Malak, owing to the finding of anal scars that might have been attributable to hemorrhoids (which the decedent had) or to anal intercourse, inquired of the police if they had any information about the possibility of Dr. Jones's having been homosexual. Apparently there was no such information. Dr. Malak explained to the police that it is quite common for a man to ejaculate when he dies a violent death. In his autopsy

report Dr. Malak found no sperm in the rectum and concluded that because of spontaneous postmortem ejaculation and the inconclusive result of the anal acid phosphatase, the finding of the few sperm on the anal smear was of no value. In view of what thus amounted to a completely negative finding, the court was right in holding that any reference to homosexuality through cross examination would have had no relevance to the issues and would have involved a danger of unfair prejudice outweighing any possible probative value of the cross examination. Uniform Evidence Rule 403, Ark. Stat. Ann. § 28-1001 (Repl. 1979).

Third, it is argued that the proof of Pitts's harassing phone calls and his sending the bullet should have been excluded as being too remote and as constituting proof of another crime (a postal violation). The testimony, however, was admissible not only to show motive but also to support Mrs. Jones's identification. Uniform Evidence Rule 404 (b). It is now suggested that a limiting instruction should have been given, but it was incumbent on the defense to request such an instruction, which was not done. *Amos* v. *State*, 209 Ark. 55, 189 S.W. 2d 611 (1945).

We find no prejudicial error in the points argued nor elsewhere in the record.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. For the first time I am dissenting solely upon the ground that I do not find the testimony of a witness to constitute substantial evidence. Without the testimony of the widow there would only be one possibility of the appellant being connected in any way to this crime. Other than the widow's testimony, one witness, an expert from Washington, D.C., stated that one Negroid hair was found about the decedent's clothing. According to the expert, the 20 characteristics found in the hair were the same as the characteristics found in appellant's hair. There were more than a dozen Caucasian hairs found about the decedent's clothing but none of them were identified. The

expert from Washington admitted he could not positively identify appellant by hair like he could fingerprints. He stated:

> Okay. To begin with I don't want to mislead anyone. A hair is not like a fingerprint. In other words, I can't say that the hair from those pants came from Mr. Pitts to the exclusion of everyone else.

His report further states:

> It is pointed out that hair comparisons do not constitute a basis for positive personal identification.

Speaking of fingerprints, it is most interesting that none of appellant's fingerprints were found in or around the residence nor in or around the vehicle where the victim was found although more than 50 sets of latent fingerprints were found. The widow indicated her attacker discarded the gloves he was wearing before he left her house.

Turning to the testimony of the widow, her statement was that she arrived home at 6:00 p.m. when the house was already dark. She explained that she could not see her husband and stated:

> And, it was dark or I couldn't see anything and I called out his name.

She testified that as the door moved inward as she opened it a man stepped from behind the door and told her to come on in. The exhibits reveal that this door opens flush with the wall (Exhibit No. 23). In other words, the door would only open to 90 degrees. It would be impossible for anyone to be behind the door. I recognize a person could have been standing in front of the door but not behind it. Although it was dark and the intruder wore a mask covering everything but his eyes, the witness stated:

> Yes. When we came in — I looked at him. He said, don't look at me.

About the same time she stated to the intruder:

It's you, isn't it, Gene?

It is difficult for me to believe that any person could identify a black man in a dark house while he was wearing a mask except over his eyes. This was the sole identification witness against the appellant.

The witness further stated the intruder remained there about 20 minutes. Since she arrived exactly at 6:00 p.m., this would mean it was 6:20 when the intruder left in the company of her husband. After the intruder left, the witness stated she worked her way to the patio door, while still bound hand and foot, and managed to open the lock with her nose. In looking at the photographs it appears that the lock is between the handle which opens the sliding glass door and the door jamb. It appears there are approximately three inches between the handle and the jamb. Therefore, it would take a rather long nose to reach into this position and unlock the sliding glass door. After this the witness allegedly slid or scooted across the lawn to a gate which also had a lock on it. The witness apparently told different stories about how this gate was opened. At one point she stated:

With my nose I unhooked the thing, you know, where it hooks.

Defense Exhibit No. 15 is a picture of the latch the witness just described as having opened with her nose. The top part of the latch, which is the part that would have to be pushed up, is 65-1/2 inches from the ground. That would be at least as high as this witness' head. At any rate, the witness stated she continued to scoot or crawl to a neighbor's house where she finally gained admission. The neighbor testified her hands and feet were tied but that her clothing did not appear to be soiled or wet. There was snow on the ground and it had been raining.

The witness also was able to get the packing out of her mouth without removing the portion of the gag which held the material in her mouth. Apparently this is so because she

still had the piece around her mouth but no material in her mouth when she arrived at the neighbor's house.

A disinterested witness, Mrs. Stanley, testified that the decedent's Land Cruiser was parked on Arlington Drive, a considerable distance from the decedent's home, by 6:07 p.m. on the date of his disappearance. The Land Cruiser was parked in front of the house next door to the witness's, and she saw two men standing by the vehicle at the time she turned into her driveway. She was of the opinion these were white men. This witness's friend came up immediately behind her and the two of them went to Skaggs Drug Store and made a purchase. When they left the drug store, the ticket tape was clocked as 6:35 p.m. Therefore, there is very little likelihood that the witness is mistaken in her statement that the vehicle bearing the decedent's body was parked next door to her house sometime before 6:07 p.m. This witness underwent hypnosis in order to be questioned about the time of day the decedent's vehicle was seen by her. Under hypnosis she stated the time was 6:07 p.m. There was another witness who stated he saw the Land Cruiser, in which decedent's body was discovered, pull up to the Arlington Drive address about 6:30 p.m. He further stated that two men got out and ran past Mrs. Stanley's house toward the field behind it. He too was of the opinion that the men were white. Both the young witness and his mother discussed matters in detail and came to the firm conclusion that the vehicle had been parked before 6:30 p.m. The Land Cruiser in which the decedent's body was found was not moved from the spot where it was parked until the police recovered it the following morning.

With three or four completely disinterested witnesses testifying the vehicle bearing the decedent's body was parked on Arlington Drive soon after 6:00 p.m. there is no reasonable possibility of it having left the decedent's residence after 6:20 p.m. At least three of the four witnesses thought the two men they observed either around the vehicle or running from it were white. This testimony cannot be reconciled with that of the widow.

In fact, during the time the intruder was in the house the

widow claims to have been in possession of his gun on at least two occasions. On one of these occasions she threw the gun into a bedroom. Also, when she was asked to lie down in the floor, the shotgun was alongside her. I cannot understand why she did not attempt to use one of these guns at some time during the episode. The widow had been harassed by Pitts in the past, and it is evident from the record that she had no use for him.

I think the hair which supports this conviction is not strong enough to bear the weight of the burden of the sentence of life without parole. There is nothing else upon which this verdict could stand. I am of the opinion that the facts in this case are so weak that they cannot uphold the verdict pronounced by the jury; therefore, I would reverse this conviction.