556 So.2d 699 (1990)
Randy BEVILL
v.
STATE of Mississippi.
No. 03-DP-85.
Supreme Court of Mississippi.
January 24, 1990.
*700 Jackson M. Brown, Paula E. Drungole, Starkville, for appellant.
Mike C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, John R. Young, Dist. Atty., Corinth, for appellee.
En Banc.
HAWKINS, Presiding Justice, for the Court:
Randy Bevill appeals his conviction of capital murder in the circuit court of Monroe County, upon change of venue from Lee County, and sentence to death. We have addressed numerous claims of error made by Bevill. One requires reversal, the introduction into evidence of an admission by Bevill, given to law enforcement officers without a Miranda warning, that he was in the neighborhood of the victim on the night of the murder. We reverse and remand. In this opinion we also give direction as to questions which either will or may recur upon retrial.

LAW
July 31, 1986, was a Thursday. Amy Clayton, who had turned 18 on July 3, graduated that May from Saltillo High School, and who expected to attend Itawamba Community College in the fall on a cheerleader scholarship, lived with her parents Joe and Carolyn Clayton at 1401 Frances Square in Tupelo. Also living at this home were Amy's two older brothers, Brad and Robert (Rob) Clayton.
Amy spent the day at the home of her maternal grandmother, who had broken *701 her leg, and was being cared for by the Claytons. Mrs. Clayton went to their home to get some clothes before spending the night with her mother on Mitchell Road, and relieving Amy. Amy left her grandmother's about 6:30 p.m.
When Amy got to the Clayton residence, only Brad was there. They went to a store for some gasoline for Amy's car and soft drinks, and then returned home where Amy prepared supper. The two ate around 7:00-7:30 p.m.
Their brother Rob came home about 7:30 and a short while later Jimmy Gray, on the softball team with the boys, arrived. The two of them left around 8:00 to go to the softball field in the Palmetto community. Around 9:00 p.m. Brad left to join the team. He invited Amy to go with him, but she wanted to stay home and jog. Amy routinely jogged on a pathway above the Joyner School around the Joyner City Park area.
This was the last Brad saw his sister alive.
Mr. Clayton was employed by the Lee County Extension Service. He was out in the field all day, and did not get off work until 6:00 or 6:30 that evening. He went to the softball game, arriving there around 9:00. Following the game he and Brad returned to the Clayton residence, arriving around 11:30.
Amy was not home, and around midnight Mr. Clayton became worried. He telephoned Mrs. Clayton who came home. He called some of Amy's friends. Around 1:00 a.m. he notified the police, who came to the Clayton residence, and Mr. Clayton accompanied them looking for Amy. They traced the area where she normally jogged. The Claytons spent a sleepless night, continuing to search and wait for Amy. Around 6:00 a.m. Mr. Clayton called his brother Jerry Lee Clayton, the chancery clerk.
Al Wallace was jogging around Legion Lake at 6:00 a.m. that Friday, August 1, and as he looked across the lake he saw what appeared to be a human body down by the lake. When he got to the area where he had spotted the body, he left the road, walked down to the lake and discovered the body of a girl who had been dead for a period of several hours.
Wallace called the police, who promptly investigated. Jerry Lee Clayton was called to the scene and identified the body as Amy.
City and county law enforcement officers investigated the scene. Sheriff Roy Sandefer and Police Chief Ed Crider assigned officers to comb the area.[1] The body was 22 feet from the road and 18 feet from the lake. The shoes were 8-to-10 feet from the body in underbrush, and a white sock was found three feet above her head. The body was slightly over a half mile north of the Clayton residence. This was not the area where Amy had customarily jogged, Joyner Park being south of Frances Square. Found 167 feet from the body was a bloodied, sleeveless, white Fruit of the Loom brand "tank top" muscle shirt, also called a "t-shirt." While called a "t-shirt" this should not be confused with military t-shirts which have short sleeves. This undershirt was made of ribbed material, size 46-48 extra large. At a distance of 515 feet from the body, near a stop sign intersection of Country Club and Legion Lake roads, a size 34 pair of J.C. Penney brand under shorts was also found.
Dr. Thomas Bennett, state medical examiner, performed an autopsy on the body in Jackson. He determined the time of death between 10:00 p.m. and 12:00 midnight on Thursday, July 31. Amy's sock and shoes had been removed, and prior to her death, one of her shoe strings was used to tightly bind her wrists in front of her body, and one of her socks was used as a gag. Dr. Bennett noted two bruises on the top of her head caused by some blunt instrument. The autopsy revealed 34 stab wounds as well as abrasions, lacerations and bruises. The vagina had been torn, bruised and scraped by something blunt, which Dr. *702 Bennett stated could have been a penis, and dead spermatozoa were found inside the vaginal vault. Dr. Bennett determined this spermatozoa had probably been deposited some time between 18 and 14 hours before the 7:30 p.m. autopsy on Friday, August 1.

RANDY BEVILL
Randy Bevill, a native of Pontotoc County, 30 years of age, was indicted on March 10, 1986, by the Pontotoc County grand jury in cause number 9041 for burglary of the inhabited dwelling of Lonnie Briggs on December 7, 1985. The same grand jury also indicted Bevill in cause number 9042 for burglary of an inhabited dwelling of Sue Hurley on September 10, 1985.
On July 11, 1986, Bevill pleaded guilty to both indictments. Bevill was sentenced on July 18, in cause number 9041 to ten years imprisonment, with the sentence suspended. He was placed on five years probation, three years supervised.
In cause number 9042 no sentence was imposed by the circuit court at the July Term. An order was entered on July 18 continuing the cause indefinitely for sentencing.
Following the crime, the officers received descriptions of suspicious or strange people in the area. Michael H. Sadler, a next door neighbor to the Claytons, furnished a description of a man seen walking toward the Clayton home around 10:15-10:30 p.m. on Thursday night. He appeared approximately five feet nine inches tall, was stocky, with a beard, dark hair, and wearing a headband, a light t-shirt and dark trousers. This description helped make a composite picture which was published in the North Mississippi Daily Journal on August 2.
Iris Cowly lived at 1201 Eugene Street, in the immediate neighborhood of the Claytons, although they were not acquainted. She and Bevill had previously dated, but had broken up. She had complained to the police that Bevill had come by her house on Thursday night, banging on the door and wanting to get in.
Larry K. Rickels, criminal investigator with the Mississippi Highway Patrol, and a resident of Lee County, led the criminal investigation. The law enforcement officers had received sufficient information to want a picture of Bevill. The sheriff's office in Pontotoc County was contacted on Saturday, August 2, and Lee Monts, a constable and deputy sheriff in Pontotoc County, informed the law enforcement officers he could obtain one. According to Monts a picture of Bevill was obtained. It was delivered by Monts to a Lee County deputy at the county line shortly after 1:00 p.m. This picture, however, is not in the record.
Monts' version of what transpired that afternoon was given at a pre-trial suppression hearing. Later that afternoon, according to Monts, he ran into Bevill at a barn in the north part of Pontotoc County. After about another hour, according to Monts, he received a radio call asking him "if I knew where I could pick this subject up at." Monts then attempted, without initial success, to locate Bevill. Still later, according to Monts, he received another radio call, and this time recognized Rickels' voice on the radio. The Lee County sheriff's office radioed "to see if I had went [sic] 10-15 with the subject." Finally, around 5:00 p.m., after searching for Bevill, Monts found Bevill with some more individuals working on a barn. According to Monts, Bevill came over to him and said, "Somebody tells me that you want to talk to me." Monts replied, "Yeah, Randy, I do. You have got to go to Tupelo with me." Bevill wanted to know the reason, and Monts replied, "Randy, I can't tell you." He also told him it was very serious and "you are going to have to go with me."
According to Monts he radioed Lee County that "I was in 10-15," and "that means that you've got your subject arrested, in custody and fixing to transport them." According to Monts, Rickels asked him if Bevill's truck was there, and Monts told him it was. Monts told one of the other men to drive Bevill's truck to Tupelo, and Bevill rode with Monts. He testified that Bevill had asked him if he could drive his own truck, and Monts told him that he could *703 not, but had to stay in the car with him [Monts].
Monts testified that he never told Bevill he was under arrest, but he did tell Bevill that "he had to go with me."
When Monts had transported Bevill to the Lee County jail, he told him that he had to go in and "talk with some investigators." Monts walked into the jail with Bevill, told the officers "This is Randy."
Monts did not give Bevill any Miranda warning.
There were several law enforcement officers gathered at the jail. Sadler was also there, although Monts did not know him. According to Monts, when Rickels came in he asked the man (Sadler) if Bevill was the man he had seen walking down the street. Sadler replied that from the picture he had seen he did not think it was Bevill, but after seeing Bevill in person he was more certain he was not the man he had seen on Thursday night.
Finally, Monts testified that Rickels said, "He was in the area and I am going to talk to him, anyway."
Monts then left.
At the same suppression hearing Rickels testified that Bevill was not under arrest, that he only wanted to ask him some questions because he had been seen in the area. Rickels, in the presence of deputy Don Barnett, questioned Bevill. The officers did not give Bevill any Miranda warning.
According to Rickels, Bevill was not a suspect when he began to question him. He asked Bevill if he had been drinking, who replied he drank eight-to-ten beers. Bevill told Rickels he had gone to Cowly's house around dark that Thursday night. He also told Rickels that he was out in the woods seeing if anybody else came to see her, and that he had parked his truck at the Parkway Baptist Church and walked to Cowly's home.
The officers learned during their questioning that Bevill was on probation, and also that his driver's license had been suspended. Bevill was not released, but held in custody until his parole officer could be contacted. Rickels considered Bevill's admission to driving while his license was suspended and drinking constituted a parole violation, as did Cowly's complaint of disturbing her at her home. Bevill was held in custody for parole violation on Saturday, August 2, and was never released from jail.
Rickels was unable to locate Bevill's probation officer on Saturday, but the following Monday, August 4, he notified the Officer Kenneth H. Valentine, who signed an affidavit charging Bevill with probation violation. Also on that date, Bart Aguirre with the Tupelo police department examined Bevill's pickup truck, a 1976 Chevrolet C-10, red with white top. He found the seat covers, removed and freshly washed, on the floorboard.
Also on that Monday deputy sheriffs Joe Davidson and John Conrad went to the home of Mrs. Hilda Wilder, Bevill's sister, in Pontotoc County. They learned from Mrs. Wilder that Bevill had been staying with her for about three weeks, sleeping on the couch. He had not come in when she went to bed at 9:30-10:00 p.m. on Thursday night, but was asleep on the couch when she went to work around 6:30 a.m. the next morning.
She gave the officers a blue Fruit of the Loom t-shirt of the same size and description (except for color) of the undershirt found near the body. The officers also got Bevill's tennis shoes. Mrs. Wilder told them she had washed the tennis shoes along with the remaining laundry Friday. She also told them that Bevill had a white t-shirt which she had not seen since Thursday.
On Tuesday, August 5, Rickels signed an affidavit for a search warrant of Bevill to obtain from him a sample of blood, saliva and hair from all parts of his body. A search warrant was issued by Thomas J. Gardner, III, circuit judge, authorizing this search. Because the personnel at the Mississippi Crime Laboratory requested additional samples, Rickels again on August 18 signed another affidavit for a search warrant, and Judge Gardner issued a search *704 warrant on that date for samples of the blood, saliva and hair of Bevill.
On August 21 a hearing was held before Judge Gardner to revoke Bevill's probation. Rickels testified at this hearing that when he questioned Bevill he was not under arrest, and was only questioned as a possible witness because he had been in the area where the crime was committed. He said they locked Bevill up until they could get in touch with his probation officer in reference to Bevill's admitting to Barnett and him that he had been drinking and being "over at a resident's house causing a disturbance which was in violation of his probation and driving under suspension." Bevill also told Rickels he had been in the area (Cowly's residence) between eight and eleven o'clock p.m. on Thursday night. Rickels testified Bevill was not given any Miranda warnings until the following Monday. Bevill did not testify at the probation hearing. He was represented at this hearing by the same counsel who represented him at trial.
Following the hearing Judge Gardner found Bevill had violated his probation by consuming alcoholic beverages and driving a motor vehicle while his driver's license was suspended. He then revoked his probation and sentenced Bevill to a five-year prison term.
After sentencing Bevill in cause number 9041, Judge Gardner then sentenced Bevill to a three-year prison term in cause number 9042.
The grand jury indicted Bevill on August 29, count I being for capital murder committed while in the commission of the crime of rape in violation of Miss. Code Ann. § 97-3-19(2)(e) and 97-3-65(2) (Supp. 1989). Count II charged Bevill with kidnapping in violation of Miss. Code Ann. § 97-3-53 (Supp. 1989). He was also charged as a habitual offender under Miss. Code Ann. § 99-19-81 (Supp. 1989) based upon his two burglary convictions.
On January 2, 1987, Bevill filed a motion to suppress the blood, saliva and hair samples resulting from the search warrants issued August 5 and 18, 1986. On March 2, 1987, following an extensive hearing, the circuit judge overruled the motion.
On March 13 Bevill filed a motion to suppress the oral statements given officers Rickels and Barnett the previous August 2, and statements made to Cary Clark, a convict in the penitentiary in Parchman. Following a hearing on March 27, the circuit judge on March 30 overruled this motion.
Upon a change of venue, trial began in the circuit court of Monroe County on March 30, 1987.

TRIAL
In addition to what has been above stated of Dr. Bennett's autopsy, he testified that he removed hair from between her hands, made pubic hair combings and pulled pubic hair, took blood samples, made vaginal swabs and found spermatozoa. He took hair fibers from the front of her shirt and arms. Her panties were blood soaked. He was of the professional opinion that the stab wounds had been made with a singleedge sharp instrument, at least four inches long and three-fourths of an inch wide.
Larry Donnell Turner, of the Mississippi Crime Laboratory, determined from his examination of Amy's and Bevill's blood that they were both type "O", a common blood type. The sperm likewise were determined to be from a type "O" secretor.
Joe Edward Andrews, the hair and fiber specialist with the Laboratory, compared the head, chest and pubic hairs pulled from Bevill with hair specimens removed from Amy's clothing and body. He also compared hair pulled from Amy's body with hair found on the bloodied t-shirt.
The hair found in Amy's hands matched her head hair. Amy's pubic combing produced a pubic hair exhibiting the same microscopic characteristics of Bevill's pubic hair.
The microscopic examination of hair removed from Amy's shirt and arms all matched hers except one which exhibited the same characteristics as Bevill's chest hair.
Hairs from the contact clothing of Amy's matched her head and pubic hair, but one *705 pubic hair exhibited characteristics of Bevill's pubic hair.
From the white t-shirt a number of hairs were examined revealing the same characteristics as Bevill's chest hair. One head and one pubic hair found on it showed the same characteristics as Amy's.
The undershorts found some distance from the body contained no substances identifying it with either Bevill or Amy.
Evidence of pubic lice were found from Amy's pubic hair combing. No evidence of pubic lice was found on Bevill.
Sadler, the neighbor, testified that when he came home around 10:30 p.m. on July 31 he saw a stranger heading south on Frances Square about 30 to 40 yards north of the Clayton residence. He was from five feet nine inches to six feet tall, stocky build, dark hair, bearded, and wearing a headband of some sort. He had on dark trousers and "light to possible white t-shirt." (R-VIII. 1220) He further testified he could not say that the man he saw at the jail on August 2 was Bevill. Bevill's beard at the time appeared heavier, and Bevill did not appear to be as old or as paunchy as the man he saw. At trial Bevill "looked similar" to the man he saw.
Bill Graddy who lived near the Parkway Baptist Church, recalled seeing a pickup truck of the description of Bevill's truck in the parking lot of the church around 10:30 p.m. on July 31.
Anita Dillard, a friend of Amy's, had been by the Clayton residence around 11:15 in the morning of July 31. She saw a man standing across the street from the Clayton's driveway, who appeared five feet eight inches to six feet tall, about thirty years of age, and weighing around 200 pounds. He had a beard and mustache, a red bandana on his head, and a white or light gray sleeveless shirt, the same style as the t-shirt found near the body. The man she saw looked like Bevill's picture at the time of his arrest.
Gary Carnathan, an attorney of Tupelo, left his office shortly before 11:00 p.m. on the night of July 31. When he turned off McCullough Boulevard onto Country Club Road en route home, the beam from his headlights revealed a man in a raincoat. The man stopped. It struck Carnathan as unusual for the man to have a raincoat on in the heat. He appeared around six feet tall, with a lot of hair on his face and head, and weighing approximately 190 pounds. The features were similar to the photograph of Bevill at the time of his arrest.
Lawrence Patrick Renfroe was riding in a friend's pickup around 10:30 p.m. on the night of July 31. At the intersection of Lawhorn Street with McCullough Boulevard, he noticed an attractive girl with her back to the road talking to a man. They were under a street light. She appeared to be around five feet seven inches tall, shapely, with light brown hair, and had on blue shorts and a light colored top. The man was around six feet tall, had on a light colored tank top or "muscle shirt," probably blue jeans, and a beard, a mustache, and very dark hair and dark eyes. He identified Bevill as the man he saw that night talking to the girl. On cross-examination Renfroe said the pickup in which he was riding was going about 35 miles per hour when he saw the man and girl. On cross-examination Renfroe also admitted to convictions of assault and battery in Florida, and of driving while under the influence of intoxicating liquor.
Mrs. Wilder testified that she and her husband had a son and daughter living with them in Pontotoc, and that Bevill moved in with them about three weeks prior to July 31. He slept on the living room couch, and kept his clothes in sacks in the utility room. The officers got Bevill's blue Fruit of the Loom tank top shirt from her. She had washed his tennis shoes on Friday, August 1, because they were in the dirty clothes basket.
Cowly lived in a duplex around the corner and behind the Clayton residence; a clump of trees was between the houses. She first met Bevill at a local bar, and began dating him in February, 1986. They went together four or five months. On July 31 she had not seen Bevill in two or three months. Cowly worked at Hancock's, a local textile plant.
*706 On the night of July 31, she returned home around 9:00 p.m. In about twenty minutes' time there were four attempts by Bevill to get her to accept a collect telephone call. She refused. He sounded angry to her, and she told the woman who lived in the adjacent duplex he would probably be over. Around 9:40 she saw Bevill through her living room window. She recognized a white t-shirt and saw the top of blue jeans. He banged on her door, begging her to let him in, but she refused. This lasted until around 10:00 p.m. Cowly called the police about his disturbing her.
She testified that she had ridden with Bevill in his pickup and it was "junky" inside. He carried a change of clothes, tapes, tools, boots and tennis shoes.
Rob Clayton testified that he worked at Hancock's, and that Bevill had also been employed there. Amy had picked Clayton up at the plant upon occasion, and he was sure that Bevill, who got off work at the same time, had seen her in the parking lot.
Rickels did not testify. Deputy sheriff Don Barnett did, however. He testified that Bevill at trial appeared quite different than when arrested. At the time of his arrest he had a beard and mustache, and his hair was different. He wore no glasses. At trial he was wearing glasses. A photograph of Bevill taken at the time of his arrest was introduced. Barnett said Bevill had told Rickels and him that he had been to Cowly's house to see her on July 31, and had waited some time for her there at her house. Bevill told them he thought she might be out with someone else, and that it was from about 7:00 or 8:00 p.m. until 10:00 or 10:30 p.m. that he waited on her. He also told the officers that there probably would have been trouble if he had seen Cowly with someone else. He also told the officers that he had parked his truck at the parking lot of the Parkway Baptist Church. Barnett said the Clayton and Cowly houses were probably about 150 yards apart, and that the church parking lot was closer than that to the Cowly residence.
There were no objections offered at trial to Bevill's admissions to the officers about being at Cowly's house on the night of July 31.
Cary Allen Clark, a convict, met Bevill at the "lockdown," the maximum security unit in Parchman. Clark had been in Parchman over nine years, after being convicted of a number of felonies in Harrison County. He testified he was sentenced to 32 years, thirteen mandatory.
According to Clark, he asked Bevill what he was in for, and he told him he was in on a parole violation for a burglary, but he was charged with murder.
Clark said he asked Bevill if he wanted to tell him about it, and Bevill told him no. Clark kept after Bevill over the next several days, but Bevill was evasive. Finally, he said Bevill got angry and told him, "All right. I killed the bitch and I f____d her, too. Now lay off the questions." (R-VIII. 1252)
Following this revelation Clark corresponded with Sheriff Sandefer in an attempt to work out some kind of transfer from Parchman to Harrison County.
When the State rested, Bevill introduced Rex White and Jimmy Cruise, residents of Pontotoc, who both testified Bevill was in a horse barn in Pontotoc County until 9:00 or 9:30 p.m. Bevill was wearing a black sleeveless shirt with a pocket, and blue jeans.
James and Ricky Grisham were with Bevill on Saturday when Monts arrested him. James Grisham drove Bevill's truck to Tupelo, and Ricky followed in another truck.
Bevill did not testify.
Other witnesses testified for both the State and the defense, but the above recitation covers the salient facts on the issue of his guilt.
Following instructions by the court, the jury first returned a verdict of guilty of capital murder, and following a sentencing hearing, the jury unanimously found that Bevill should suffer the death penalty.

LAW

I. SUFFICIENCY OF EVIDENCE
Bevill argues that evidence against him was "too flawed" to support a conviction of capital murder.
*707 He first attacks the hair analysis, not as to the sufficiency, however, but the witness Andrews giving statistical probability based upon a Canadian study. Hair analysis is a very useful took in criminology. The circuit judge upon retrial should be guarded in the use of statistics in buttressing an expert witness's testimony, although probability analyses may be admissible in appropriate and carefully circumscribed instances. See: United States v. Massey, 594 F.2d 676, 36 A.L.R.3d 1194 (8th Cir.1979); State v. Carlson, 267 N.W.2d 170 (Minn. 1978); People v. Di Giacomo, 71 Ill. App.3d 56, 27 Ill.Dec. 232, 388 N.E.2d 1281 (1979); State v. Clayton, 646 P.2d 723 (Utah 1982); Pitts v. State, 273 Ark. 220, 617 S.W.2d 849 (1981); 1 D. Louisell & C. Mueller, Federal Evidence, § 104 (1977); Guadette & Keeping, An Attempt at Determining Probabilities in Human Scalp Hair Comparison, 19 Forensic Science 599 (1974); Hair Analysis, 38 Proof of Facts 2d 377 (1984).
The proof of the blood type in both the victim and Bevill being type "O," and that this was the type found in all the stains was admissible. Type "O" is the most common type in the human race, and this fact in and of itself proved little.
Finally, Bevill attacks the credibility of the convict Clark. The credibility of a witness is for the jury. Clemons v. State, 535 So.2d 1354, 1358 (Miss. 1988); White v. State, 532 So.2d 1207, 1215 (Miss. 1988); Williams v. State, 463 So.2d 1064, 1069 (Miss. 1985); Warren v. State, 456 So.2d 735, 738 (Miss. 1984); Browning v. State, 450 So.2d 789, 791 (Miss. 1984). Clark's interest in securing some relief from his miserable existence was there for the jury to consider in weighing his credibility. The State never attempted to pass him off as a paragon of virtue. Bevill did not request a cautionary instruction such as generally given when co-defendants or accomplices testify as State witnesses. Wood v. United States, 310 F.2d 52, 53 (5th Cir.1962); Robinson v. State, 465 So.2d 1065, 1069 (Miss. 1985); Bell v. State, 411 So.2d 763, 765 (Miss. 1982); Wilson v. State, 234 So.2d 303, 311 (Miss. 1970); Prisock v. State, 244 Miss. 408, 141 So.2d 711 (1962); Walley v. State, 240 Miss. 136, 126 So.2d 534 (1961); Boyce v. State, 239 Miss. 405, 123 So.2d 452 (1960).
Bevill complains on appeal of a letter Clark wrote the sheriff. In this first letter Clark has obviously marked over "ss" in the word "kissed," changing them to "11." He thus wrote that Bevill had told him, "Yes I killed the bitch, f____d her too, now lay off with the questions." There are two answers to this contention. Counsel for Bevill had an opportunity to cross-examine Clark as to this amendment in the letter to the sheriff, but chose not to do so, reserving his complaints to an appellate brief. Pinkney v. State, 538 So.2d 329, 338 (Miss. 1988), and Jones v. State, 517 So.2d 1295, 1310 (Miss. 1987). Second, had Clark left the word "kissed" as he initially wrote, it would still have been a damning admission if Bevill in fact said it. The weight and worth of Clark's testimony was for the jury. Moreover, in this case it went before the jury without contradiction. Lutes v. State, 517 So.2d 541, 550 (Miss. 1987); Peoples v. State, 501 So.2d 424, 427 (Miss. 1987); Pharr v. State, 465 So.2d 294, 302 (Miss. 1984); and Redmond v. State, 457 So.2d 1344, 1345 (Miss. 1984).
It was the prerogative of the jury, in determining whether Bevill committed this atrocious killing, to consider the number of hairs examined microscopically, that none excluded either Amy or Bevill, and the incriminating hairs matching the known samples from Bevill and Amy. Also for the jury was the testimony of Cowly that he was in the area, and the identification by Renfroe, on the night of the murder.
Then there was the unexplained fact that Bevill's tennis shoes and seat covers on his truck were found laundered on the pickup floorboard. While unusual, in ordinary circumstances the laundering might not be suspicious. Coupled with the fact that Amy's slaying was gory and unquestionably accompanied by a profuse bleeding from many parts of her body in which the killer could hardly escape getting bloodied himself, the time of these cleansing jobs becomes pregnant with meaning.
*708 There is no merit to Bevill's contention that the underlying felonies of rape and kidnapping were not supported by the evidence. There was ample evidence that Amy was "forcibly ravished" within the meaning of Miss. Code Ann. § 97-3-65(2), Fisher v. State, 481 So.2d 203 (Miss. 1985); and that a kidnapping occurred within the meaning of Miss. Code Ann. § 97-3-53. See: Wilcher v. State, 448 So.2d 927, 935 (Miss. 1984); Neal v. State, 451 So.2d 743 (Miss. 1984); Brewer v. State, 459 So.2d 293 (Miss. 1984); Jenkins v. State, 507 So.2d 89 (Miss. 1987).

II. ADMISSIBILITY OF ADMISSIONS TO LAW ENFORCEMENT OFFICERS; ADMISSIBILITY OF CLARK'S TESTIMONY AS BEING FRUIT OF AN ILLEGAL ARREST
The major thrust of Bevill's complaint under this assignment is that the testimony of Clark was incompetent. Bevill contends he was sent to Parchman on a parole violation which resulted from information obtained following an illegal arrest and not having received the Miranda warning, and consequently the statements made to Clark were "fruit of the poisoned tree." Silverthorne Lumber Co. v. U.S., 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426 (1920); Weeks v. U.S., 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). We reject this argument for the reasons hereinbelow set forth.
In this same assignment, however, Bevill also argues that the testimony of Barnett at trial was inadmissible for the same reason, that he received no Miranda warning. Here we must conclude reversible error was committed.
When Bevill was brought to Tupelo by Monts, following questioning by Rickels he admitted to having been in the neighborhood of the Clayton residence on the night of July 31, that he had parked his truck at the Parkway Baptist Church, and that he was spying on Cowly. After informing the officers he was on probation, he also admitted to having drunk several beers that night, and driving while his driver's license was suspended. According to Rickels, based upon his admitting the probation violation, Bevill was kept in jail.
The State makes no contention but that Bevill was entitled to a Miranda warning if he was under arrest, but contends that he was not under arrest. It is uncontradicted that Bevill was taken into custody by Monts, a constable and deputy sheriff of Pontotoc County, and told he had to go with the officer to Lee County, and that it was a very serious matter. Bevill was not allowed to drive his own truck. When left with the officials in Lee County, Bevill told them no more about his whereabouts on the night of July 31 than they had already been told, that he was in the area that night and at Cowly's house. Yet he was never released. It simply defies reason to assume any ordinary person under such circumstances, whether innocent or not, would not with good reason consider himself under arrest, and we must so hold. U.S. v. Bengivenga, 845 F.2d 593 (5th Cir.1988); U.S. v. Corral-Franco, 848 F.2d 536 (5th Cir.1988).
Rickels may have assumed that Bevill was not under arrest when he questioned Bevill, but that is not the test. If he had any intention of questioning Bevill without first giving him the Miranda warning, it was incumbent upon him to have ascertained clearly from Monts that Bevill had not been taken into custody, and there was no reason for Bevill to believe he was in custody. Neither Rickels nor Barnett made any such inquiry of Monts. Bevill had good reason to consider himself under arrest, and Rickels was under a duty to give him the Miranda warnings before questioning him. Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966); Griffin v. State, 339 So.2d 550, 553 (Miss. 1976); White v. State, 290 So.2d 616, 619 (Miss. 1974); Smith v. State, 229 So.2d 551, 556 (Miss. 1969). In failing to do so, Bevill's statements to the officers should have been suppressed at the pre-trial hearing, and Barnett's testimony of his admissions should not have been admitted as a part of the State's case-in-chief. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 *709 L.Ed.2d 441 (1963); Neal v. State, 451 So.2d 743, 757 (Miss. 1984), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984); Brunson v. State, 264 So.2d 817, 820 (Miss. 1972); Williams v. State, 220 So.2d 325, 328 (Miss. 1969).
While the State clearly established by Cowly that Bevill had been at her home that night, we cannot hold Bevill's statements harmless error, because two of his witnesses, White and Cruise, testified he was in Pontotoc County, some 15-to-20 miles' distance, and either at the same time or very shortly before the time Cowly testified he was at her residence. Richardson v. Lucas, 741 F.2d 753, 756 (5th Cir.1984); Pinkney v. State, supra, 538 So.2d at 351; Carleton v. State, 425 So.2d 1036, 1041 (Miss. 1983).
It should also be noted that while there was no Miranda warning given, there is nothing in this record to suggest that Bevill's admissions were not freely and voluntarily made. We do not hold them inadmissible evidence as impeachment. See: Powell v. State, 483 So.2d 363 (Miss. 1986); 14 A.L.R.4th 678, Impeachment of Credibility.
It should also be noted that while Rickels may not have considered Bevill under arrest when he questioned him, the law enforcement officers at the time could very well have had sufficient information to bring him in for questioning. Cowly had notified the officers he was at her home disturbing her, the description given by Sadler and others of the person seen in the area, the pickup truck, and the photograph of Bevill, as well as his own description, furnished reasonable cause for taking him into custody for questioning. Alexander v. State, 503 So.2d 235, 239 (Miss. 1987); Moore v. State, 493 So.2d 1295, 1298 (Miss. 1986); Henry v. State, 486 So.2d 1209, 1212 (Miss. 1986); Riddles v. State, 471 So.2d 1234, 1236 (Miss. 1985); Powe v. State, 235 So.2d 920 (Miss. 1970). Boches v. State, 506 So.2d 254, 264 (Miss. 1987); Floyd v. State, 500 So.2d 989, 991 (Miss. 1986), cert. denied, 484 U.S. 816, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987); Swanier v. State, 473 So.2d 180, 186 (Miss. 1985).

III. CLARK'S TESTIMONY
The information furnished by Rickels to the probation officer that Bevill had admitted to drinking beer and driving while his driver's license was suspended was the basis upon which that officer made an affidavit charging Bevill with parole violation.
Bevill argues that because his commitment to Parchman resulted from an illegal arrest, and having been given no Miranda warning, that his statements to Clark were "fruit of the poisonous tree" and therefore incompetent as evidence.
Bevill's commitment to Parchman was legal and within the lawful discretion of the circuit judge for the following reasons:
(1) At the probation violation hearing, Bevill was represented by the same attorney who represented him at trial. Rickels testified without dispute that when he questioned Bevill he was not under arrest or in custody, and free to leave. From the evidence presented to the circuit judge at the hearing, there was no reason to reject Rickels' testimony. Bevill did not testify and did not call Monts as a witness. If Bevill wanted to claim he was under arrest, as he later asserted, it was incumbent upon him to assert this defense at the hearing and offer some evidence in support of it. A circuit judge should not be faulted for not acting on evidence never called to his attention. In failing to do so, Bevill waived any right to claim at some subsequent time that the circuit judge acted without authority. Pinkney v. State, supra, 538 So.2d at 338; Cole v. State, 525 So.2d 365, 369 (Miss. 1987), cert. denied, ___ U.S. ___, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988), reh'g denied, ___ U.S. ___, 109 S.Ct. 826, 102 L.Ed.2d 815 (1989); Jefferson v. State, 386 So.2d 200, 202 (Miss. 1980).
(2) Bevill was not only sentenced to Parchman for violating his probation, but in cause number 9042 as well, in which case the circuit judge had authority to impose sentence in any event.
(3) In all likelihood the officers would have learned independently of Bevill's admissions that he had violated his parole. *710 Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Rooks v. State, 529 So.2d 546, 555 (Miss. 1988); In re Hill, 460 So.2d 792, 803 (Miss. 1984); Hill v. State, 432 So.2d 427, 435 (Miss. 1983), cert. denied, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983); Cf. Walker v. State, 473 So.2d 435 (Miss. 1985).
(4) Moreover, while we are not required to address this question in this case, in Federal courts, at least, the purely technical failure to give a Miranda warning does not preclude the admission at a probation violation hearing of an otherwise voluntary statement given to law enforcement officers. U.S. v. Johnson, 455 F.2d 932 (5th Cir.1972), cert. denied, 409 U.S. 856, 93 S.Ct. 136, 34 L.Ed.2d 101; 30 A.L.R. Fed. 824, 835-836, Admissibility of Evidence in Federal Probation Proceeding.

IV. DENIAL BEVILL'S RIGHT TO PARTICIPATE IN HIS OWN DEFENSE
Bevill claims he was denied his Constitutional right under Article 3, § 26 to conduct his own defense.
Section 26. In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both ...
We reject the first instance he claims because the record does not support his contention.
The second instance occurred when the court announced, "Counsel for the Defendant may make an opening statement." Then, without having notified either the court or opposing counsel of any intent to do so, Bevill stated, "Ladies and gentlemen ...," preparatory to making an opening statement. In fact, Bevill's counsel, just previous to both sides making their opening statement, had in chambers led the circuit judge to believe that he, counsel, was going to make the statement. Bevill's conduct obviously caught the circuit judge by surprise. The circuit judge had not been forewarned, and had not been given an opportunity to advise the defendant of his right as well as personal responsibility and duty to the court in event he chose to personally conduct his defense.
We must hold that it was error for the court not to permit Bevill himself to make an opening statement. Trunnell v. State, 487 So.2d 820, 825-826 (Miss. 1986).
It must also be recognized that a circuit judge is charged with conducting a decorous, orderly trial, and protecting an accused's rights. A defense attorney who is made aware by his client that he wishes to personally conduct his own defense has an obligation first to fully advise his client his Constitutional right, and also the responsibility and risk entailed.
Defense counsel also has an obligation, as an officer of the court, to inform the circuit judge prior to exercise of the right, of his client's desire to do so. This is a fundamental ethical obligation of the defense counsel, in order to give the circuit judge an opportunity to instruct as well as warn the defendant outside the presence of the jury of his rights and responsibility. The circuit judge can then generally inform the accused of the civility that will be required of him in his remarks, conduct, and statements made to the court, jury, witnesses and opposing counsel, and what he should do in event of objections and rulings by the court. For any litigant to act as his own lawyer is unusual, and when the circuit judge is notified of such intent, the court is required to proceed cautiously in seeing that the accused is afforded his constitutional rights, and at the same time that the trial proceedings are civilized and decorous.
Also, in this case, because Bevill chose to make an opening statement, it would have been important for the court to warn him that if he stated facts which only he could support, and then later did not take the witness stand himself, the State would be free to comment upon the fact that no such statement was made by him as a witness under oath. Jones v. State, 381 So.2d 983, 994 (Miss. 1980). An accused who does not intend to testify himself under oath cannot be permitted, any more than any other litigant, to have the jury consider as evidence any statements of fact *711 not subject to rigorous cross-examination of the witness under oath.

V. ADMISSIBILITY OF BLOOD AND HAIR SAMPLES
Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), holds that the involuntary taking blood from a person under arrest for driving while intoxicated does not implicate the Fifth Amendment privilege against self incrimination. Also, Wesley v. State, 521 So.2d 1283, 1286 (Miss. 1988); Williams v. State, 434 So.2d 1340, 1345 (Miss. 1983). As to the Fourth Amendment, the Court held: "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." 384 U.S. at 767, 86 S.Ct. at 1834, 16 L.Ed.2d at 917. And, "compulsory administration of a blood test plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment," protecting "persons ... against unreasonable searches and seizures ..." 384 U.S. at 767, 86 S.Ct. at 1834, 16 L.Ed.2d at 918.
As to a compelled intrusion into the body for blood, the Court analyzed:
[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In other words, the questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness.
384 U.S. at 768, 86 S.Ct. at 1834, 16 L.Ed.2d at 918.
Continuing, the Court held that even though a blood sample was relevant to the reason for the defendant's arrest, this in and of itself did not necessarily mean the arresting officer himself could require an involuntary removal of blood, rather than obtaining a search warrant from a neutral and detached magistrate. Yet in upholding the search the Court noted that because the percentage of alcohol in the blood diminished shortly after drinking stopped, and the risk entailed because of the time required in obtaining a search warrant for this purpose, the officer "... might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened `the destruction of the evidence'." 384 U.S. at 770, 86 S.Ct. at 1835, 16 L.Ed.2d at 919-920.
Finally the Court noted that the blood was removed in a reasonable manner, and that there was no Fourth Amendment violation. The blood had been removed by a physician at a hospital. Likewise, in this case no complaint can be made as to the manner in which the blood, saliva and hair were removed, and indeed Bevill makes no such complaint. The saliva and hair samples were taken by a registered nurse.
Bevill's complaint is directly solely to the lack of probable cause upon which the search warrant was issued.
As to the removal of Bevill's blood, about all such evidence proved was that he was not excluded. Blood samples from the items of clothing were all type "O"; Amy's blood was type "O", and Bevill's blood was type "O". Yet type "O" is the most common blood type in the human race. It would be difficult to find reversible error in the admission of this evidence, even if the removal of the blood had violated Bevill's rights under the Fourth Amendment to the United States Constitution, or Art. 3, § 23 of the Mississippi Constitution.
The hair samples did constitute probative physical evidence, however, and if either Bevill's state or federal constitutional right against unreasonable searches was violated in the removal of hair samples from his person, this would require reversal.
Courts have had difficulty in concluding that involuntary removal of hair samples in and of itself implicates the Fourth Amendment. U.S. v. Weir, 657 F.2d 1005 (8th Cir.1981), involved the involuntary removal of the arrested petitioner's head, beard and mustache hair. The court of appeals observed:

*712 Unquestionably, the Government had good reason to examine Weir's hair. The FBI had previously recovered clothing which, according to the informant, Weir wore in the robbery; strands of hair found on a ski mask were to be compared with Webb's hair.
* * * * * *
Because the intrusion upon Weir's person was so minor, even if it could be said that he did not consent to the search and seizure, fourth amendment rights were not implicated.
657 F.2d at 1007. Also, U.S. v. D'Amico, 408 F.2d 331, 332-333 (2nd Cir.1969); In re: Grand Jury Proceedings (Mills), 686 F.2d 135 (3rd Cir.Del. 1982), cert. denied, 459 U.S. 1020, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982); National Treasury Employees Union v. Von Raab, ___ U.S. ___, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); State v. White, 621 S.W.2d 287 (Mo. 1981); State v. Ruebke, 240 Kan. 493, 731 P.2d 842 (1987), cert. denied, 483 U.S. 1024, 107 S.Ct. 3272, 97 L.Ed.2d 770 (1987); U.S. v. De Parias, 805 F.2d 1447, 1456 (11th Cir.1986). Cf. Bouse v. Bussey, 573 F.2d 548 (9th Cir.1977).
Giving Bevill the benefit of the argument, however, we nevertheless conclude there was no constitutional violation in obtaining hair or blood samples from him. As above noted, he was under lawful arrest on August 5, and the officers in this case as in Weir, "had good reason to examine" his hair.
Moreover, the detailed underlying facts supporting the affidavits executed by Rickels for both search warrants clearly furnished the circuit judge with probable cause for issuing them. The underlying facts for the affidavits for search warrants executed on August 5 and August 18, 1986, are virtually identical, and the first is set forth in full as an appendix.
An affidavit for a search warrant is a means of presenting to the issuing officer a basis upon which he may determine whether in fact probable cause exists. See, Powell v. State, 355 So.2d 1378 (Miss. 1978). In discussing probable cause for search warrants, it was held in Hall v. State, 455 So.2d 1303 (Miss. 1984), that "[p]robable cause [for the issuance of a search warrant] exists when facts and circumstances within an officer's knowledge, or of which he has reasonable trustworthy information, are sufficient within themselves to justify a man of average caution in the belief that a crime has been committed and that a particular person committed it." 455 So.2d at 1304. See also, Holland v. State, 263 So.2d 566 (Miss. 1972) Probable cause, however, means less than evidence which would justify condemnation. See, Hester v. State, 463 So.2d 1087 (Miss. 1985); Powe v. State, 235 So.2d 920 (Miss. 1970).
The United States Supreme Court in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), set a "totality of the circumstances" approach and stated, in determining whether probable cause existed for a particular search or issuance of a search warrant, the judge must scrupulously examine facts, make careful evaluation, and in his best judgment gleaned from life's experiences, determine whether he has a substantial basis for concluding probable cause existed. See also, Rooks v. State, 529 So.2d 546 (Miss. 1988); Breckenridge v. State, 472 So.2d 373 (Miss. 1985).
Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), states a defendant may challenge an ex parte issuance of a search warrant on the truthfulness of the statements contained in the affidavit if the defendant makes a preliminary showing that the statements were knowingly or intentionally false, or made in reckless disregard of the truth. 438 U.S. at 171, 98 S.Ct. at 2684. If the defendant accomplishes this, then he is entitled to a hearing to determine if there was probable cause for the issuance of the search warrant, and if the alleged false statement was necessary for finding probable case, the search must be voided and the fruits excluded. Id. at 171-172, 98 S.Ct. at 2684-85.
Information, however, may be purged from an affidavit and the remainder of the affidavit may be considered to determine if probable cause existed for the issuance of the search warrant. See, Walker v. State, 473 So.2d 435 (Miss. 1985).
*713 Bevill's assertions that there was a Franks v. Delaware, supra, violation are unconvincing. It is true that subsequent events proved Rickels erred in some of the statements set forth in the underlying facts, e.g. that the hair in the victim's hands was the same color as Bevill's, the similarity of Bevill's tennis shoes' footprints and the footprint at the scene, and bloodstain on the tennis shoes. Even so, at the suppression hearing Rickels was cross-examined at great length by Bevill's attorney, and there was no showing that Rickels intentionally misrepresented those facts, or made them in reckless disregard for the truth. Moreover, the remaining underlying facts clearly constituted probable cause for the issuance of the search warrants.
Bevill was in the area at the time of the slaying, and trying to get in Cowly's house during the time period when Amy was murdered. Lawrence Renfroe saw a young woman and a man wearing a white muscle shirt, and matching Bevill's description at 10:00 p.m. not far from the Clayton residence. The seat covers on Bevill's truck had been freshly laundered, and his truck was recently washed. The bloodied undershirt found near the body was the same size and brand as worn by Bevill. According to Rob Clayton, Bevill had opportunity to see Amy and her car, and know the location of the Clayton residence.

VI. NEUTRAL MAGISTRATE
There is no merit to Bevill's claim that the circuit judge who issued the search warrants was not neutral and detached. The basis for this contention is that the circuit judge who went to the scene of the crime and saw the body also issued the search warrants. There is no showing how this in and of itself created any prejudice or bias towards Bevill. Bevill made no claim of the incompetency of the issuing magistrate at the lengthy suppression hearing when he had opportunity to develop any such allegation. Compare: Lockett v. State, 517 So.2d 1317, 1322-1323 (Miss. 1987); McCommon v. State, 467 So.2d 940, 942 (Miss. 1985), cert. denied, 474 U.S. 984, 106 S.Ct. 393, 88 L.Ed.2d 345 (1985).
In deference to the circuit judge, however, we must state that in a case of this magnitude and importance, a circuit judge would be prudent to avoid the risk of a claim such as this.

VII. RENFROE'S CONTROLLED SUBSTANCE VIOLATION
Renfroe positively identified Bevill as the person seen talking to a young woman in the crime area and in the time frame of the crime. Upon cross-examination the defense sought to discredit him because of previous convictions for driving while under the influence of intoxicating liquor, assault and battery, and controlled substance violation. The circuit court permitted Bevill's counsel to adduce before the jury his driving under the influence and assault and battery convictions, but because his conviction for controlled substance violation apparently had been expunged, the court held that under Rule 609(c) of the Mississippi Rules of Evidence (MRE) proof as to this conviction was inadmissible. The record is not clear, but Bevill's counsel apparently sought to develop somehow that the prosecution was involved in the expungement of this conviction. At least, Bevill argues this reason on appeal as a basis for this evidence.
Prior to the adoption of the MRE, proof of a witness's conviction of a crime was competent as a general attack on his credibility. Miss. Code Ann. § 13-1-11 (1972); Mhoon v. State, 464 So.2d 77, 82-83 (Miss. 1985); Baker v. State, 307 So.2d 545 (Miss. 1975).
Under Rule 609 a prior conviction is not automatically admissible on cross-examination, and there are restrictions delineating when and under what circumstances a prior conviction is admissible simply as a general attack on credibility. Under Rule 609(c) such conviction is never admissible if the defendant has been pardoned, or the conviction annulled or expunged.
In this case the defendant's purpose for developing facts as to this conviction was not simply to discredit Renfroe because he had been convicted of such a *714 crime (which may very well have been inadmissible under some provision of Rule 609), but to ferret out any motive or reason Renfroe might have to be such a favorable state witness. Any evidence of the prosecution's participation in the expungement of public record of a criminal conviction of Renfroe would, of course, be relevant as bearing on Renfroe's impartiality, or direct interest in testifying for the State. Upon remand, the defense should be afforded the opportunity to ascertain whether or not the prosecution participated in any way in the expungement of some conviction of Renfroe, and if so, to cross-examine Renfroe of such facts as a basis for showing special motive or interest in testifying for the State. Rules 401, 402, 404(b) MRE. The full factual development of the prosecution's involvement, if any, can be developed at a pre-trial hearing or in chambers, and if it should develop that the prosecution did participate in any way in such expungement, the defense should be permitted to cross-examine Renfroe as to this when and if he testifies as a witness.

DISCOVERY VIOLATION
We reject Bevill's contention that there was a violation of Rule 4.06 of the Uniform Criminal Rules in the State's failure to furnish him prior to trial of a copy of a statement of Jimmy Cruse, a defense witness, and copies of all of Clark's letters to the law enforcement officials. As to Cruse's statement, the "exculpatory" information was that Bevill had been with him in Pontotoc on the night of July 31, a fact to which he testified as a defense witness. As to Clark's letters, it is unclear whether Bevill was in fact furnished copies of all of them, or not. In any event, Bevill was fully informed as to Clark's testimony, and the letters were repetitive and non-exculpatory.
We do take this occasion to remind circuit judges and district attorneys that it is of the utmost importance that Rule 4.06 be liberally applied so as to give the accused an opportunity to view for himself whether or not material is exculpatory. As we stated in Williamson v. State, 512 So.2d 868, 882 (Miss. 1987)
More recently, we have held that prosecuting attorneys should make available to attorneys for the defense all materials, whether written or recorded, in order that the defense may determine whether or not the material is useful to the defense of the case. Hentz v. State, 489 So.2d 1386, 1388 (Miss. 1986). The statements in this case clearly fall into this category and should be made available to the defense prior to the retrial of this case. Further, we take this opportunity to remind circuit judges and prosecutors alike. Rule 4.06 envisions a two way discovery and contemplates complete co-operation between the parties in order to avoid trial by ambush and to ensure that the criminal defendant is afforded a fair trial. Although our decisions in this area have been something less than consistent, we urge trial judges especially to pay close attention to the guidelines set forth in Rule 4.06 and our caselaw interpreting it in order to avoid costly errors which might otherwise cause reversal. See, Hentz v. State, 489 So.2d 1386, 1389 (Miss. 1986); see also, White v. State, 498 So.2d 368, 370 (Miss. 1986); Foster v. State, 493 So.2d 1304, 1308 (Miss. 1986); Johnson v. State, 491 So.2d 834, 837 (Miss. 1986)... . [Emphasis added].

INSTRUCTIONS
We have carefully reviewed the instructions given at the conclusion of the guilt phase and find that the State's instructions and Bevill's instructions together correctly apprised the jury of the law in this case.
We do not address the assignments of error as to any of the instructions given during the sentencing phase.
We have reviewed the other assignments of error as to the trial proceedings, and find them of no merit.
For the reasons stated, this case is reversed and remanded for a new trial.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.
*715 DAN M. LEE, P.J., concurs in result only.
PITTMAN, J., not participating.

APPENDIX A

UNDERLYING FACTS AND CIRCUMSTANCES PURSUANT TO AFFIDAVIT FOR SEARCH WARRANT
On the first day of August, 1986, at approximately 6:30 A.M., the body of Amy Carol Clayton, age eighteen, was found near Legion Lake in the City of Tupelo, in Lee County, Mississippi. Her hands were bound, her mouth gaged. There were some thirty-four stab wounds about her lifeless body.
The following items of physical evidence were found about, and in the vicinity of, the body of Ms. Clayton (hereinafter called the victim). These items of evidence are presented item by item, together with conclusions as to the evidentiary value of the item.
1. A quantity of bloodstained hair was found in the hand of the victim's body. After being examined and washed by the Mississippi Crime Lab, that hair proved to be the same general color as that of Randy O'Neal Bevill (hereinafter referred to as the defendant).
2. A white sleeveless body shirt, stained with blood was found near the body of the victim. On the shirt were found what appeared to be hairs. A statement of the defendant's sister, Hilda Wilder, revealed that her brother (who lived with her) owned two body shirts of the size found at the scene; and, further, that the white shirt was missing after the first of August. Ms. Wilder's statement to the officers revealed that the morning the victim's body was found, she saw the defendant sleeping on the couch (defendant's usual sleeping place) in her den. His jeans and tennis shoes were present, but his shirt was absent.
3. At the scene, on the pavement, there was a print in dust. The print appeared to be of the same design as that of the tennis shoe belonging to the defendant. A photograph was made of the print for comparison with the shoe of the defendant by the crime lab. The defendant's tennis shoes, when recovered, had been very recently washed by his sister. A field spot test revealed the presence of blood on the shoes.
4. The victim was stabbed thirty-four times. The defendant's sister, Hilda Wilder surrendered nine knives belonging to the defendant. Defendant's nephew, Robert Wilder, told officers that defendant had a knife that he kept on the dash of his pickup. Young Wilder showed officers a similar knife, which, according to the wounds observed by officers and the State Medical Examiner, would be consistent with the weapon used to stab the victim. The knife normally kept on the dash of defendant's pickup is missing. A diver is on the way to cover Legion Lake in search of the knife.
5. Victim's pubic area was bruised and torn. Seminal fluid was present in the vaginal vault of the victim. A blood sample from the defendant would allow a comparison and possible match of blood types by analysis of the seminal fluid. In the case of genital-to-genital contract there is often a transfer of pubic hair, which gives rise to a need for pubic hair samples from the defendant.
Evidence other than that found at the scene also links the defendant to the victim. Among that evidence are:
1. On the night of July 31, 1986, according to the defendant's statement to officers, defendant had been drinking. He had consumed eight to ten beers.
2. Again, according to defendant's statement, he was in the vicinity of the victim's home from about 9:00 P.M. until approximately 11:00 P.M. Defendant stated that he parked his truck in the vicinity of Parkway Baptist Church and walked to a location near the home of Iris Cowly in order to set up a watch to observe possible rival suitors. The fact that defendant's truck was parked near the Church was corroborated by independent witnesses. Victim's home was on *716 the logical route from the location of the parked truck to the home of Ms. Cowly.
3. Ms. Cowly, who lives about one hundred yards from the victim's home, stated that the defendant was trying to get into her house about 11:00 P.M. on the night the victim was last seen.
4. The Medical Examiner gave the opinion that the victim had probably met her death between the hours of 9:00 P.M. and 3:00 A.M.
5. Somewhere around 10:00 P.M. on the 31st day of July, two witnesses, Jerry Adameck and Lawrence Renfroe, saw the victim, whom they knew, talking to a person whom they did not know. That person was described as a white male, wearing a white muscle shirt, and that this individual met the description of the defendant. That conversation was reported to have taken place at the intersection of McCullough Boulevard and Lawhon Street  a location not far from the victim's home.
6. On many occasions, victim had taken her brother, Rob Clayton, to work at Hancock's. The defendant also worked there and had opportunity to see victim on many occasions. Defendant had opportunity to see victim's car and when walking by the victim's home (Ms. Cowly said their walks had taken them by the victim's home) had ample opportunity to see victim's car and recognize the location of the victim's home.
7. An examination of defendant's pickup truck (defendant admitted driving the truck that night) revealed that the vehicle had been completely washed on the outside, the seats had been cleaned, the floor mats had been replaced, the seat covers had been removed, washed and were lying on the floorboard of the truck. The seats had been wiped clean. Iris Cowly told officers that defendant never washed his truck. Defendant admitted to Officer Rickels that he had washed his truck on Friday.
Based on the above-stated facts and the reasonable inferences to be drawn therefrom, there appears probable cause to believe that the defendant killed the victim and that the defendant is in possession, in the form of head and body hair, saliva and blood, of certain evidence which may prove invaluable in the proving that the defendant did in fact kill and murder the victim.
NOTES
[1] While Legion Lake and the tract of realty owned by the local American Legion post is surrounded by the city of Tupelo, under an anomalous situation this particular area has never been incorporated into the city.