KING, Justice,
dissenting:
¶204. In two previous direct appeals, this Court has reversed Flowers’s conviction and death sentence as a result of prosecutorial misconduct. In Flowers v. State, 842 So.2d 531 (Miss.2003) (.Flowers II), the prosecution’s argument of facts not in evidence resulted in reversal. Finding that a Batson[27] violation had occurred, this Court reversed and remanded Flowers v. State, 947 So.2d 910 (Miss.2007) (Flowers III ), for a new trial. Despite the same errors occurring in today’s case, the Majority, in a stark departure from this Court’s previous Flowers opinions, finds that Flowers’s conviction and death sentence should be affirmed. Because the errors in today’s case resulted in Flowers being denied his right to a fair trial, I dissent.
I. Prosecution’s Argument of Facts Not in Evidence
¶ 205. There are three instances of the prosecution arguing facts not in evidence in today’s case: (1) the prosecution misstated the time Sam Jones discovered the victims’ bodies at Tardy’s; (2) the prosecution stated an unsupported basis for Flowers’s alleged motive; and (3) the prosecution incorrectly described Porky Collins’s reaction to the photo arrays. In Flowers II, 842 So.2d at 550, the prosecution’s misstatement of facts during closing argument was one basis, inter alia, for this Court’s reversal. In that appeal, Flowers cited approximately fourteen alleged misstatements. Id. at 555. This Court found that the following misstatements by the prosecutor resulted in an unfair trial: (1) that defense witnesses tried to coercé the State’s witnesses to lie; (2) that Sam Jones received a call at 9:30 a.m. from Bertha Tardy asking him to come to the store; and (3) that Flowers “was mad” about losing his job and having his pay docked. Id. at 555-56.
¶ 206. The statements that resulted in this Court reversing Flowers’s conviction and death sentence in Flowers II are notably similar to the statements raised in today’s case. While this repetition of pros-ecutorial misconduct is alarming, the Majority’s approval of the same is even more startling. Courts have long recognized— and reasonably feared — that misconduct during closing argument may become commonplace in our trial courts. Despite regular admonishments, such misconduct still occurs:
That despite our consistent warnings to the Government we should still be called *1084 upon to admonish against such conduct is reprehensible per se because it constitutes a disregard for our directives. But additionally it is particularly pernicious because it results in an unnecessary waste of judicial resources, both at the trial and appellate level, by diversion and attention to review of what now should be understood to be totally unacceptable conduct by those who lay claim to representing the Government....
U.S. v. Maccini, 721 F.2d 840, 846 (1st Cir.1983). The Majority in today’s case, by endorsing the prosecutor’s misstatements — the same misstatements which warranted reversal in Flowers II — takes Mississippi one step closer to having misrepresentation of the facts presented at trial commonplace in our trial courts.
A. Sam Jones’s Testimony Regarding His Arrival At Tardy’s
¶207. Sam Jones died prior to Flowers’s 2010 trial, and his testimony from Flowers’s 2007 trial was read into evidence. Flowers claims that the State misrepresented Jones’s testimony regarding the timeline of events the morning of the murders. Jones testified as follows:
A. Well, [Bertha Tardy] called me and asked me — I had promised her I would come down and help them load out a truck and go on a delivery. And she called me to ask me about was I coming down there. And I told her that I was. And then about, that was about 15 minutes after 9:00, I think, when she called, somewhere along in there.
Q. About what time did you get to the store that morning, Mr. Jones?
[[Image here]]
A. I got to the store; it was before — it was right at, between 9:15 and 9:30.
Q. Okay.
A. I will put it like that. It wasn’t 9:30.
Q. Okay. You got to the store between 9:15 or right around that time?
A. Yes.
Although Jones testified that he arrived at Tardy’s between 9:15 and 9:30 a.m., the State attempted to question Jones later about the timeline and misstated that he arrived closer to 10:00 a.m.:
Q. Okay. And I think — I might have misled you a little bit. It was, when you got to the store, that was going to be closer on up to 10 o’clock, wasn’t it?
Flowers’s Counsel: Object to leading, Your Honor.
Court: Overruled.
Jones never responded to this question.
¶ 208. In its closing argument, the State discussed the timeline for the morning of the murders and apparently put the timeline on some type of marker board. During the timeline discussion, the prosecution stated: “Mr. Sam Jones came into the store slightly after 10:00 on the morning of the 16th and discovered the bodies.” Flowers did not object to this statement at closing argument.
¶ 209. In Flowers II, 842 So.2d at 550, this Court addressed whether this same issue was procedurally barred by lack of contemporaneous objection. This Court applied plain error, to the issue, and found that the prosecution’s misstatements warranted reversal. Id. “The plain error doctrine requires that there be an error and that the error must have resulted in a manifest miscarriage of justice.” Williams v. State, 794 So.2d 181, 187 (Miss.2001) (citing Gray v. State, 549 So.2d 1316, 1321 (Miss.1989)), overruled on other grounds by Foster v. State, 148 So.3d 1012 (Miss.2014).
¶ 210. In Flowers II, 842 So.2d at 555, the prosecution stated that Sam Jones had *1085 testified that Bertha Tardy had called him at 9:30 a.m. Reviewing this statement, this Court stated:
After a thorough examination of the record, it is clear from Jones’s testimony that he testified he arrived at Tardy’s at 9:30. He never once stated he was called at 9:30 on the morning of July 16, but he did testify he arrived at the store around 9:30. On direct examination, the State never questioned Jones about a specific time. He only stated he received a call from Mrs. Tardy on the morning of July 16. On cross-examination, Jones was asked what time he arrived at Tardy’s, and he answered it was around 9:30.
Id. at 556. This Court then found that “[t]he cumulative effect of the State’s repeated instances of arguing facts not in evidence was to deny Flowers his right to a fair trial.” Id.
¶ 211. Flowers claims that the statement in today’s case prejudiced him by essentially skewing the timeline in the State’s favor. Porky Collins and Clemmie Flemming both testified that they saw Flowers near Tardy’s around 10:00 a.m. Flowers claims that if Jones’s testimony had been accurately described — that he arrived at the store between 9:15 and 9:30— the question of what Flowers was doing so close to the scene of a murder thirty to forty-five minutes after the murders could have occurred would have been raised in the jurors’ minds.
¶ 212. There is no doubt that the prosecutor’s statement is not supported by Sam Jones’s testimony and that there is no direct evidence supporting the contention that Jones arrived at Tardy’s at 10:00 a.m. The prosecution’s statement is not based on facts and prejudiced Flowers by deliberately painting an incorrect picture for the jury of the events surrounding the discovery of the murders — this same picture was painted in Flowers II.
B. Flowers’s Motive
¶ 213. The second misstatement Flowers cites relates to his alleged motive to commit the murders. Similar to Sam Jones’s testimony and the timeline described above, misstatements related to Flowers’s motive were another basis for this Court’s reversal in Flowers II, 842 So.2d at 556. In Flowers II, 842 So.2d at 555-56, this Court found that the prosecution’s statement that Flowers “was mad” as a result of losing his employment with Tardy’s was a misstatement of the facts:
[T]he prosecutor argued to the jury that [Robert] Campbell had testified that Flowers was mad because Mrs. Tardy had terminated his employment and was holding money out of his paycheck to cover the damaged batteries. Defense counsel objected on the basis that the prosecutor was mischaracterizing Campbell’s testimony, and when the prosecutor responded that he was quoting verbatim from his notes, the trial court overruled the defense objection.... After a thorough examination of Campbell’s testimony, it is clear Campbell never testified Flowers was upset at Mrs. Tardy. The State never questioned Campbell about Flowers’s feelings toward Tardy or about any money. On redirect, Campbell was asked if Flowers ever mentioned anything was wrong with Mrs. Tardy, and Campbell stated Flowers never mentioned anything to him.

Id.

¶ 214. In today’s appeal, Flowers claims that the following statement by the prosecutor was not based on facts in evidence:
The investigators learned pretty quickly when they asked who in the world could have had some reason, some motive, some anything to attack four people like this.
*1086 Have you had anybody that’s had beef with the store? Just one. Well, that doesn’t mean he did this though, does it? No. But you check that out. You look at him. And in the course of deciding what, if anything, Curtis Flowers had to do with this crime.
Flowers claims that no evidence was presented at trial supporting the contention that he was angry as a result of his termination. In response, the State argues that the following supports the contention that Flowers “had beef’ with Tardy’s:
1. Flowers losing his job days prior to the murders.
2. Bertha Tardy deducting the cost of damaged inventory from Flowers’s paycheck.
3. Police Chief John Johnson’s testimony that the Tardy family considered Flowers a threat:
Q. Okay. How did Curtis Flowers become a suspect by then, by 6:30?
A. I knew that the Tardy family had considered Curtis a threat and that they were concerned about their safety dealing with him.
4. Investigator Jack Matthew’s testimony about employees who had been feed from Tardy’s:
Q. You asked who else had worked there the last couple of years and those kind of things?
A. Well, we asked if there was anybody that they’d had any problem with or anybody that had been fired from there, and that was the — Curtis was the only one.
5. Doyle Simpson’s testimony that Flowers had “problems” with Tardy’s:
Q. Okay. Did you know anything about Curtis having any problems with Tardy Furniture.
A. I had heard about it.
¶ 215. This evidence cited by the State supports the contention that Tardy’s employees were concerned about Flowers. But the feelings and perceptions of Tardy’s employees must be distinguished from Flowers’s perception. The statements cited by the State do not establish that Flowers had ill will toward Tardy’s employees. Further, Doyle Simpson’s testimony is too vague to support a statement that Flowers “had beef’ with the store. “Problems” could easily refer to the firing itself or the damaged inventory. The State’s contention that Flowers “had beef’ with Tardy’s is unsupported by the facts. As this Court recognized in Flowers II, this factually unsupported statement resulted in Flowers having an unfair trial.
C. Porky Collins’s Response to Photo Arrays
¶ 216. Next, Flowers claims that the prosecutor misrepresented Porky Collins’s response to the first photo array — the array that contained a photograph of Doyle Simpson. Flowers claims that this misrepresentation was particularly prejudicial because part of his defense was based on the alternative theory that Doyle Simpson was the perpetrator. Collins saw two African-American men arguing outside Tardy’s the morning of the murders. When Collins testified, he stated that he did not remember if he identified Simpson as one of the men standing outside Tardy’s. The notes taken during the photo arrays state that Collins had the following reaction to the array containing Simpson’s photo:
# 1 and # 3 resembles, but hairline was further back
#6 pointed to Simpson, said hairline like this, may have appeared a little darker.
“But it looks like him.”
“Face was also same shape, round like this.”
“Unable to be positive.”
*1087 Investigator Wayne Miller testified that Collins did point out Simpson during the photo array:
Q. • All right. So he did actually point out Mr. Simpson here as somebody who was — looks like the person he’d seen; is that a fair characterization?
A. Right.
¶ 217. The State presented the following closing argument related to Collins’s identifications:
When Porky found out that some people had been murdered in front of Tardy’s, he told James Taylor Williams. He said I saw something I think y’all ought to know about. He said I think I can identify that guy if I see him again. Now, here’s the interesting thing about Mr. Porky Collins. Porky didn’t know Curtis. Never claims to have ever seen him before. Didn’t know him. Didn’t know those other people, as far as them having seen him. Porky says I can identify him.
I’m going to refer to this some more in a minute but I just want you to — you’ve seen these. We had them passed to y’all. Here are two line-ups. These line-ups were shown to Porky at the same setting. First was this one that has Doyle Simpson’s picture on it. Because later on when they did this lineup, they already knew that the gun came out of Doyle’s car. And so they gave this thing to Porky first and said is the guy that you saw in front of Tardy’s in this group.
Now, if he was going to make a misiden-tification, ladies and gentlemen, that would have been the perfect time for him to pick one of these guys and say yeah, there he is right there. But you know what? Porky did not misidentify anybody. He said the guy ain’t there. They took another six photographs and said look at this second set. He said that’s him right there. You heard Mr. Miller talk about Porky, said he was positive. He made a positive identification.
Now, why is Porky’s i.d. — Porky doesn’t know him. Porky wasn’t able to say yeah, I know him. When he saw the photograph of Curtis Flowers, he pointed him out. So you have got two different kinds of identifications and they agree. You’ve got identification by all these witnesses who knew him, Porky, who didn’t know him, and they both agree. And he was offered — Porky was offered a prime chance to mess up. The perfect chance to make a mistake. He almost — it didn’t develop out that way it, but it was almost like a trick.
You know, see if he is in there. No, he is not. Is he in the second group? Yeah. That’s him right there. So that’s a pretty strong identification, isn’t it?
¶ 218. While the State correctly characterizes Collins’s identification of Flowers in the second photo array, the State deliberately fails to recognize Collins’s statement that Simpson’s photograph in the first array “looks like” a man he saw outside of Tardy’s and that he was “unable to be positive.” The State’s argument that Collins stated “the guy ain’t there” is not an accurate representation of Collins’s identification. Because Flowers’s defense was based, in part, on the argument that Doyle Simpson was a likely suspect for the murders, the State’s misstatement regarding Collins’s identification of Simpson prejudiced Flowers.
¶219. As in Flowers II, the prosecution’s repeated argument of facts not in evidence in today’s case prejudiced Flowers and denied him his right to a fair trial. Under this Court’s heightened review of death penalty cases,- these misstatements — standing alone — should be enough to warrant reversal. See Fulgham v. State, 46 So.3d 315, 322 (Miss.2010) (“What *1088 may be harmless error in a case with less at stake becomes reversible error when the penalty is- death.”)- This Court’s prior admonishment of essentially the same statements in Flowers II bolsters a finding of reversal. See U.S. v. Drummond, 481 F.2d 62, 62 (2d Cir.1973) (“Because of the repeated misbehavior of this prosecutor in this and prior cases, we feel compelled to reverse the decision of the trial court on the sole ground of prosecutorial misconduct.”).
II. Jury Selection Process
¶ 220. Flowers claims that the State violated the Equal Protection Clause of the Fourteenth Amendment when it struck five African-American jurors after utilizing disparate questioning and citing pre-textual reasons. Because a review of the record in today’s case reveals that a Bat-son violation did occur, I dissent.
¶ 221. “It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full protection which others enjoy.” Strauder v. West Virginia, 100 U.S. 303, 309, 25 L.Ed. 664 (1880), abrogated on other grounds by Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Racial prejudice in the prosecution’s jury selection results in “state-sponsored group stereotypes rooted in, and reflective of, historical prejudice.” J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 128, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Thus, for years, courts have held that racial discrimination by the State during the jury selection process violated the Equal Protection Clause. Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (quoting Georgia v. McCollum, 505 U.S. 42, 44, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992)).
¶ 222. In an effort to remedy the prejudices existing in jury selections, the United States Supreme Court has, over the years, developed various standards for establishing purposeful discrimination. In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled by Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court attempted to regulate purposeful discrimination through presuming the legitimacy of prosecutors’ strikes except in the case of longstanding patterns of discrimination — when in case after case no African Americans served on juries, then “giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purposes of the peremptory challenge [were] being perverted.”
¶ 223. Swain ⅛ approach did little to remedy the problem of purposeful discrimination in jury selection. Thus, in Batson, the United States Supreme Court “held that a defendant could make out a prima facie case of discriminatory jury selection by ‘the totality of the relevant facts’ about a prosecutor’s conduct during the defendant’s own trial.” Miller-El, 545 U.S. at 239, 125 S.Ct. 2317 (quoting Batson, 476 U.S. at 94, 106 S.Ct. 1712). The State must then come forward with race neutral bases for the peremptory strikes. Batson, 476 U.S. at 97, 106 S.Ct. 1712. “The trial court then has the duty to determine if the defendant has established purposeful discrimination.” Id. at 98, 106 S.Ct. 1712.
¶ 224. Batson, however, is not without flaws. Thus, in Miller-El, the United States Supreme Court refocused on all of the relevant circumstances of the case, rather just the proffered race-neutral bases provided by the State:
Although the move from Swain to Bat-son left a defendant free to challenge the prosecution without having to cast *1089 Swain’s wide net, the net was not entirely consigned to history, for Batson ⅛ individualized focus came with a weakness of its own owing to its very emphasis on the particular reasons a prosecutor might give. If any facially neutral reason sufficed to answer a Batson challenge, then Batson would not amount to much more than Swain. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand. Hence Bat-son ⅛ explanation that a defendant may rely on “all relevant circumstances” to raise an inference of purposeful discrimination.
Miller-El, 545 U.S. at 239-40, 125 S.Ct. 2317 (citing Batson, 476 U.S. at 96-97, 106 S.Ct. 1712).
¶225. Thus, in finding that a Batson violation occurred in today’s case, I consider all of the relevant circumstances in Flowers’s case.
A. History of Flowers’s Case
¶ 226. In Flowers III, 947 So.2d at 935, this Court found as “strong a prima facie case of racial discrimination as we have ever seen in the context of a Batson challenge.” In Flowers III, the State exercised all twelve of its peremptory strikes on African-Americans and all three of its strikes of alternate jurors on African-Americans. After reviewing the individual strikes in the case, this Court found that the State engaged in purposeful discrimination during jury selection. Id. at 939. Thus, the Court reversed and remanded for a new trial on this basis. Id. The same prosecutor who this Court found to have engaged in purposeful discrimination in Flowers III prosecuted the trial before this Court on appeal today. On its own, this fact is not dispositive of a finding of racial discrimination. This history, however, cannot be ignored and is part of the relevant circumstances that must be considered in this case.
¶ 227. In Miller-El, 545 U.S. at 253, 125 S.Ct. 2317, the United States Supreme Court considered the “widely known evidence of the general policy of the Dallas County District Attorney’s Office to exclude black venire members from juries at the time [the defendant’s] jury was selected.” If the history of discrimination by a district attorney’s office is a permissible consideration under Batson, surely the history of the same prosecutor in the retrial of the same case is a legitimate consideration. To not consider this history is to rebuff Batson’s direction that “all relevant circumstances” must be considered. Bat-son, 476 U.S. at 96-97, 106 S.Ct. 1712; Miller-El, 545 U.S. at 239-40, 125 S.Ct. 2317.
B. Disparate Treatment-The Numbers
¶ 228. Like the history of today’s case, a review of the statistics relating to the prosecutor’s use of peremptory strikes is not, standing alone, dispositive of the Bat-son inquiry. These numbers, however, reveal a clear pattern of disparate treatment between white and African-American veni-re members. In today’s case, a special venire of 600 citizens was drawn. The original venire consisted of forty-two percent African Americans. After the jury qualification and initial for-cause challenges, the venire consisted of twenty-eight percent African Americans. Ultimately, one African American served as a juror and one African American served as an alternate juror. Despite the initial ve-nire consisting of forty-two percent African Americans, the jury that convicted and sentenced Flowers consisted of eight percent African Americans.
¶ 229. An analysis of the number and type of questions asked by the prosecutor *1090 further reveals a pattern of disparate treatment. During individual voir dire, the prosecutor asked white jurors an average of approximately three questions. African-American jurors, however, were asked approximately ten questions each by the prosecutor.
¶ 230. Further, in what appears to be mere lip service to the voir dire process, when questioning most white jurors during individual voir dire, the prosecutor essentially repeated questions that the trial court had just asked. The trial court asked each juror standard death-penalty-qualification questions. The prosecutor would then — in substance — ask the same questions and then hand the juror off to be questioned by the defense. The prosecutor asked only nine percent of white jurors something beyond these duplicated questions.
¶ 231. In a stark contrast, the prosecution asked sixty-three percent of African Americans questions outside of the standard death-penalty-qualification questions. As an example, fifty-five percent of African-American jurors who had some kind of connection to the Flowers family (through work, the community, or family) were asked questions by the prosecutor about this connection. Although five white jurors had similar connections to the Flowers family (through work and the community), the prosecutor failed to ask any questions about these connections.
¶232. As noted in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), statistical analysis can raise a question as to whether race influenced the jury selection process. The numbers described above are too disparate to be explained away or categorized as mere happenstance.
C. Individual Jurors
¶233. The pattern of disparate treat-' ment is further revealed when comparing the treatment of individual jurors. See Flowers III, 947 So.2d at 921 (citing Manning, 765 So.2d at 519) (A side-by-side comparison of jurors is helpful to determine whether purposeful discrimination existed.).
1. Carolyn Wright
¶234. The State exercised one of its peremptory strikes on Carolyn Wright for the following reasons: (1) she knew several of the defense witnesses; (2) she was sued by Tardy’s for an overdue account; and (3) she used to work with Flowers’s father, Archie Flowers, Sr. During the Batson hearing, Flowers rebutted the State’s bases for its peremptory strike first by noting that Pamela Chesteen, Harold Waller, and Bobby Lester all had a significant number of acquaintances involved in the case. Flowers responded to the fact that Tardy’s had sued Wright by noting that the State had not questioned white jurors regarding their accounts at Tardy’s. Finally, Flowers rebutted the basis relating to Wright’s working relationship with Flowers’s family by comparing Wright to Chesteen, who was a bank teller at a bank where the members of the Flowers family were customers.
¶ 235. Finding that the State’s reasons for striking Wright were race-neutral, the trial court specifically noted that all jurors were asked by the court during group voir dire if they had accounts with Tardy’s and whether they had been sued by Tardy’s. The court found that this basis was race neutral because none of the white venire members reported that they had been sued by Tardy’s. The trial court found that Wright’s working relationship with Archie Flowers was distinguishable from the professional relationship Chesteen had with the Flowers family. Specifically, the court stated that the Winona Wal-Mart was a “relatively small” Wal-Mart and seemed to imply that Wright had a close relationship *1091 with Archie Flowers because of the small size of the store. The trial court also stated that no white jurors had reported working at Wal-Mart with Archie Flowers. The trial court summed up its finding by stating:
If the only reason the State offered was that she knows some of these defense witnesses, then there might be something there. But the fact is knowing these defense witnesses that you’re intending to call, plus the fact that Tardy’s had to sue her, plus the fact that she worked with Archie, in my mind, creates race-neutral reasons for striking her.
Each of the State’s reasons for the peremptory strike is analyzed below.

Wright’s Relationships with Persons Involved in the Case

¶236. In sum, Carolyn Wright had some type of connection to thirty-four people involved in Flowers’s case. Flowers compares Wright to Chesteen, who knew thirty-one people involved in Flowers’s case; Waller, who knew eighteen people involved in the case; and Lester, who knew twenty-seven people involved in the case.
¶ 237. Similar to Wright, Chesteen, Waller, and Lester all had a significant number of relationships with witnesses and persons involved with the case. One indi-cium of pretext this Court considers is “the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge.” Flowers III, 947 So.2d at 917 (quoting Manning, 765 So.2d at 519). As such, this basis is suspect.
¶ 238. Flowers also claims that the State mischaracterized Wright’s relationships with Flowers’s family. Specifically, Flowers points out that the State claimed that Wright knew Flowers’s sister, Sherita Baskin. Wright, however, never indicated that she knew Baskin. The State does not address this in their brief. This one statement could have simply been a slip of the tongue. However, “lack of support in the record for the reason given for a peremptory strike has been identified as an indicator of pretext.” Flowers III, 947 So.2d at 924 (citing Manning, 765 So.2d at 519).

Wright’s Litigation with Tardy’s

¶239. Flowers’s claims that the State mischaracterized Wright’s litigation with Tardy’s by claiming that her wages had been garnished as a result of the litigation. There is nothing in the record supporting the contention that Wright’s wages were garnished. The only statements Wright made regarding the actual litigation were that she was sued, but that “it was paid off.” Wright also stated that her involvement with the litigation would not affect her if she were selected as a juror. During the Batson hearing, the State produced a copy of the judgment in Wright’s case, and Flowers’s counsel asked if a garnishment order was attached. The trial court did not directly respond to this question, but instead stated that “it’s an abstract of justice court where she was sued.” Because there is no evidence that Wright’s wages were garnished, the State did mischaracterize its basis for the peremptory strike. Further, unlike the misstatement discussed above relating to Wright’s acquaintance with Sherita Bas-kin, the statement that Wright had her wages garnished seems to go directly to reasoning for the State’s strike — that Wright would have some sort of ill will toward Tardy’s as a result of her wages being garnished. It is easy to imagine that litigation which ends in friendly terms — for example, a settlement — might result in the parties having different feelings toward one another as opposed to a suit which results in garnished wages. As such, the State’s unsupported characterization of the lawsuit is problematic. See *1092 Flowers III, 947 So.2d at 924 (citing Manning, 765 So.2d at 519).

Wright’s Working Relationship with Archie Flowers, Sr.

¶ 240. Wright worked with Flowers’s father, Archie Flowers, Sr., at Wal-Mart; and on its face, this basis seems to be race-neutral. See Manning, 735 So.2d at 340 (This Court “has condoned a peremptory challenge against a juror who was acquainted with the defendant’s family.”). However, a review of the record reveals that this basis may have been pretextual. Although the State cited Wright’s working relationship with Archie Flowers as a basis for its strike, the State made no effort during voir dire to question Wright about the working relationship beyond a general question as to whether the relationship would affect her ability to serve as a juror. One could easily assume that the two worked in different departments and during different shifts. Further, Wright stated during group voir dire that she was unaware of whether Archie Flowers still worked at Wal-Mart or if he had retired. This supports an inference that Wright and Flowers did not have a close working relationship. The lack of questioning related to this basis is suspect. See Miller-El, 125 S.Ct. at 2328 (failing to conduct meaningful voir dire on subject with which State is allegedly concerned suggests that “explanation is a sham and a pretext for discrimination”).
¶ 241. The questionable nature of the State’s reason is compounded by its failure to strike Pamela Chesteen. Chesteen worked at a local bank in Winona and stated that she knew Archie Flowers, Sr., Lola Flowers, and Flowers’s sisters from her work at the bank. Although the coworker relationship and bank-employee/customer relationship are not exactly comparable, the concern relating to the influence such relationships would have on a juror are the same — a concern that the coworker or employee would be influenced toward a family member of another coworker or a customer. The disparate treatment of Wright and Chesteen, along with the failure to conduct meaningful voir dire regarding Wright’s working relationship with Archie, Sr., suggests this basis for the State’s peremptory strike was pretext. See Flowers III, 947 So.2d at 924 (“Failure to voir dire as to the characteristic cited for the strike is also an indicator of pretext.”).
¶ 242. When the State’s bases and the record in today’s case are viewed in toto, there is evidence of disparate' treatment and pretext. See id. at 937 (“Though a reason proffered by the State is facially neutral, trial judges should not blindly accept any and every reason put forth by the State, especially where, as here, the State continues to exercise challenge after challenge only upon members of a particular race.”).
2. Dianne Copper
¶ 243. The State provided the following reasons for striking Dianne Copper: (1) she worked with Archie Flowers and Cora Flowers, Flowers’s sister; (2) she knew several members of the Flowers family; (3) she stated that she “leaned towards” Flowers’s side of the case; and (4) she knew several defense witnesses. For the most part, the State focused on Copper’s statement that she would lean toward Flowers as a result of her relationships with the Flowers family.
¶ 244. Flowers rebutted the State’s reasons by again noting that several white jurors with multiple connections to persons involved in the case had not been challenged by the State. Flowers also argued that the State did not attempt to rehabilitate Copper when she stated that she would lean toward Flowers’s side of the case. The trial court accepted the State’s reasons as race neutral, finding that Cop *1093 per s relationships with persons connected to the case were distinguishable from those of the white jurors not challenged by the State. The trial court also found that Copper was distinguishable from other jurors because she stated that she would tend to favor Flowers’s side of the case and had worked with Flowers’s father and sister.

Copper’s Relationships with Persons Connected to the Case

¶ 245. Similar to his argument relating to Carolyn Wright, Flowers claims that the State’s strike of Copper was pretextual because white jurors who knew several defense witnesses were not struck. Further, Flowers claims that the State mis-characterized Copper’s statements relating to whether she “leaned towards” Flowers in the case as a result of her relationship with the Flowers’s family.
¶246. Copper knew thirty-one people involved in the case. Copper also testified about her relationship with the Flowers family and witnesses during voir dire:
Q. Now, I noticed that you told us the other day that you lived on Harper Street at one time?
A. Yes, sir.
Q. That y’all [Copper and the Flowers family] lived on the same street.
A. Not on the same street. Because they — they live on Cade Street, and I lived on Harper Street.
Q. Don’t they live on the corner of Cade and Harper?
A. Well, I guess. I’m not — I—you know, my street is Harper and then its — as it go around — that’s where I assume it was Cade Street. I’m not positive.
Q. Okay. And you’ve stated that you worked with the defendant’s sister at Shoe World?
A. That’s correct.
Q. And which sister was that?
Cora. <j
How long did /all work together? &
Probably a year or two. <¡
Okay. You worked with the defendant’s father? &
Yes, sir. <¡
How long did you work with him? &
Estimating, probably — possibly about the same, one to two years. <j
Okay. And I want to make sure my notes are right, because we can all write down things wrong. You stated that you knew his father Archie Flowers. &
Yes, sir.
You know his brother, Archie, Jr.?
Yes, sir. I know his brother.
You know his mother Lola?
Yes, sir, I do.
You know witnesses in this case, Hazel Jones?
Yes, sir, I know her.
You know Kittery Jones, a witness in this case?
Yes, sir, I know him. í>
And you know Danny Joe Lott, a witness in this case? «O
Yes, sir.
And I think it was yesterday and my notes show that, you said that the fact that you know all of these people could affect you and you think it could make you lean toward him because of your connection to all of these people. Is that correct?
A. It — it’s possible.
Q. Okay. That would be something that would be entering into your mind if you were on the jury, wouldn’t it?
Yes, sir. ¡>
And it would make it to where you couldn’t come in here and, just with <© *1094 an open mind, decide the case, would it?
A. Correct.
¶247. Flowers’s counsel attempted to rehabilitate Copper:
Q. ... What I’m trying to find out is just as you could put aside all the information you heard before about this case, could you not also put aside the fact — if you got picked as a juror, put aside the fact that you have met Mr. Flowers, that you know some other people in these cases and be fair to the Tardys, the Stewarts, the Goldens, and Rigbys, and make whatever decision or vote that you’re going to make based on the evidence and the evidence only. Could you do that?
A. I feel like I could. But, you know, it—
Q. Is what you’re saying—
A. Of course, it would make me, you know, feel uncomfortable. But if I had to, do it, you know, I got to do what I got to do.
Q. Okay. So you’re saying that— thank you. You’re saying that you’ll be uncomfortable. You’d prefer not to — I get the impression you’re saying that you’d rather not be a juror. But if you got picked to be one, you would take the responsibility seriously, and you would follow the law and the rules that the Court give[s] you, and you would put aside anything that you are required to put aside and make your evidence and make your vote based on just the evidence you hear in the courtroom. Is that fair to say?
A. Yes, sir. That’s correct.
¶ 248. As mentioned above, one indici-um of pretext is “the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge.” Id. at 917 (quoting Manning, 765 So.2d at 519). As such, the State’s basis that Copper knew several witnesses in the case is suspect. While the other bases the State provided appear to be race neutral — namely, Copper’s relationship with Flowers’s family and the possibility that if could cause her to “lean toward” Flowers, the unchallenged jurors with a shared characteristic 'must still be considered.
3. Flancie Jones
. ¶ 249. The State provided the following reasons for striking Jones: (1) she is related to Flowers; (2) she was late for jury selection on two separate occasions; and (3) she provided inconsistent statements on her view of the death penalty by lying on her juror questionnaire in an attempt to avoid serving as a juror. After reviewing the record, the State’s bases for striking Jones appear to be race neutral.
4. Tashia Cunningham
¶ 250. The State cited Cunningham’s working relationship with Flowers’s sister and her wavering statements on the death penalty as bases for its peremptory strike. During the Batson hearing, Flowers’s counsel rebutted the State’s reasons by pointing out that Cunningham stated that she could set aside her relationship with Flowers’s sister and be a neutral juror. Defense counsel also compared Cunningham to Chesteen, the juror who knew several of Flowers’s family members from working at a local bank. Finally, Flowers’s counsel compared Cunningham’s alleged wavering views on the death penalty to views of white jurors. The trial court found that both of the State’s reasons were race-neutral:
And Ms. Cunningham’s all-over-the-map response to the death penalty, plus her situation about working so closely with Mr. Flowers’s sister, in my mind, the *1095 State has shown race-neutral reasons for that strike.

Cunningham’s Working Relationship with Flowers’s Sister

¶251. During voir dire, Cunningham stated that she and Sherita Baskin, Flowers’s sister, did not have a close relationship; Cunningham described it as a “working relationship.” According to Cunningham, she and Baskin would “sometime” see each other, but would not see each other at work every day. Cunningham also stated that she worked at the end of the assembly line, and Baskin worked at the front of the line. The two women worked the same shift for two or three years.
¶ 252. Apparently, the State called Cunningham’s employer, ADP, to confirm her testimony relating to her working relar tionship with Baskin. During individual voir dire, the State asked Cunningham further questions about the relationship:
Q: And you work with the Defendant’s sister, Sherita Baskin?
A: Yes.
Q: Now, the other day, I think you said that you do not work close to her?
A: No, I do not.
Q: Would you think about that for a minute?
A: I do not.
Q: Are you sure that you do not work side by side with her?
A: No, I do not.
Q: And you’re saying that under oath?
A: Yes, sir.
¶253. In response to Cunningham’s statements, the State called an ADP quality control clerk, Crystal Carpenter, to give testimony. Carpenter testified that Cunningham and Baskin both worked on the “raw 2 line” and that the women worked side-by-side — “nine or ten inches” apart from one another. Twenty-five to thirty-five persons worked on this particular assembly line. Carpenter also testified that the women would occasionally not work side-by-side if another employee was absent from work and a spot in another location needed to be filled, but that the women typically worked next to one another. Carpenter observed the women working every day and based her testimony on her personal observations. Flowers’s counsel asked Carpenter if there was documentation supporting the location of Cunningham and Basking on the assembly line, and Carpenter stated that she could provide documentation supporting her testimony. Apparently, Carpenter did not provide the documentation.
¶254. At first glance, the conflicting testimony of Cunningham and Carpenter tends to provide a race-neutral basis for the State’s challenge. See Manning, 735 So.2d at 340. When considering the voir dire process as a whole, however, the State’s investigation of Cunningham is suspect. As discussed above, the State accepted Pamela Chesteen as a juror even though she stated that several members of the Flowers family were customers at the bank where she worked. There is .no evidence in the record that the State further investigated the relationship between Chesteen and the Flowers family, and the State did not voir dire Chesteen on this subject. The absence of voir dire and investigation for Chesteen compared to the thorough investigation for Cunningham is problematic and tends to evidence disparate treatment. See Miller-El, 125 S.Ct. at 2328 (failing to conduct meaningful voir dire on subject which State is allegedly concerned suggests that “explanation is a sham and a pretext for discrimination”); see also Flowers III, 947 So.2d at 924 (“Failure to voir dire as to the characteristic cited for the strike is also an indicator of pretext.”).

*1096
Cunningham’s Wavering Views on the Death Penalty

¶ 255. The State cited Cunningham’s wavering views on the death penalty as another basis for its challenge. On her juror questionnaire, although she stated that she had “no opinion” on the death penalty, Cunningham stated that she would not consider the death penalty under any circumstances. During voir dire by the trial court, Cunningham initially stated that she could not consider the death penalty as a punishment, but she then stated that she “might” consider it:
Q: ... [wjhat’s your view on even considering the death penalty?
A: I would not.
[[Image here]]
Q: Are — are you saying you would not consider it?
A: No, sir.
Q: Even if the law allowed it and the facts justified it, you just could not even consider it?
A: No, sir.
[[Image here]]
Q: So — but again, just tell me again what your feelings are on the death penalty.
A: I don’t believe in the death penalty.
Q: And would there be a possible— could you consider it?
A: I don’t think so.
Q: You don’t think so?
A: I don’t think so.
Q: But there’s — in your own mind, you might could — are you saying you could possibly?
A: I don’t think so.
Q: See, I’m not asking you to make a— you know, you haven’t heard anything. And all we want to know is whether you could consider that as a possibility — that as a sentencing possibility, because you and your fellow jurors will decide the sentence, but I just want to know if you could even consider that as a possible sentence?
A: I might. I might. I don’t know. I might.
Q: So you might be able to consider that?
A: (Nodding head).[28]
Then during voir dire by the State, Cunningham returned to her initial position of not being able to consider the death penalty:
Q: All right. As far as the death penalty — and I want to make sure I understand what you’re saying — if the law authorized the death penalty in this case and you found that the facts of the case that came from the stand justified it, could you, in fact, vote for the death penalty?
A: I don’t think so.
[[Image here]]
Q: Could you consider the death penalty yourself if the facts justified it and the law allowed it?
A: I don’t think so.
Q: You don’t think so.
A: That I could.
When questioned by defense counsel, Cunningham then stated that she could consider both punishments:
Q: ... And what you’re required to do is just consider both, then decide which way you want to vote. Do you understand now?
A: Yes, sir.
*1097 Q: And that’s your decision. And with that being the case, can you consider both options, then vote your conscience?
A: Yes.
¶ 256. This Court has recognized that a juror’s views on the death penalty may provide a race neutral basis for a peremptory challenge. See Batiste v. State, 121 So.3d 808, 848 (Miss.2013); Flowers III, 947 So.2d at 920-21. In Flowers III, this Court found that the striking of an African-American who had “virtually indistinguishable” views on the death penalty as compared to white jurors who were not struck raised an inference of discrimination, although, standing alone, it did not warrant the finding of a Batson violation. Flowers III, 947 So.2d at 921. In today’s case, there are no white jurors who survived for-cause challenges whose views on the death penalty were comparable to Cunningham’s. As such, it cannot be said that this basis was pretext.
¶ 257. This race-neutral basis, however, does not erase the prosecutor’s highly suspect investigation of Cunningham’s working relationship with Flowers’s sister. Batson, 476 U.S. at 96-97, 106 S.Ct. 1712; Miller-El, 545 U.S. at 239-40, 125 S.Ct. 2317. No evidence in the record provides a basis for the in-depth investigation. Likewise, nothing in the record evidences that a similar investigation was performed for all other jurors. With this suspect record, the prosecution’s unusual investigation of Cunningham must be seen for what it is worth — a questionable search for a race neutral basis.
5. Edith Burnside
¶ 258. The State provided the following reasons in support of its peremptory strike of Burnside: (1) she knew Flowers and members of his family; (2) she was sued by Tardy’s Furniture; and (3) she provided inconsistent statements regarding her views on the death penalty.

Burnside’s Litigation with Tardy’s

¶ 259. During voir dire, the trial court asked the entire venire if anyone had been sued by Tardy’s, and Burnside responded that she been sued by the store. Later, Burnside explained that she was able to pay off the amount that she owed the store and that the litigation stemmed from a misunderstanding about her account after the murders occurred. During the Batson hearing, the State represented that Burnside had a garnishment issued against her. The prosecutor stated: “She also was sued by Tardy Furniture, and a garnishment was issued against her. She tried to deny that and said that she just settled with them when she came back but she was, in fact, sued by them.” The State’s description of the litigation and Burnside’s testimony regarding the same is not completely supported by the record. In response to the trial court’s first inquiry during group voir dire, Burnside stated: “I had an account there, but I was not sued by Ms. Bertha. It was later on when it was took over by Mr. Frank and Roxanne.” Burnside then confirmed that she was sued by Tardy’s.
¶ 260. Then, during individual voir dire, Burnside further explained the suit:
A: .... Let me explain that. I worked for Ms. Bertha. She hired me to work for Mr. Tardy before she was married to him the first time. I was caring for Ms. Lena Tardy. That’s how I met Ms. Bertha. So when me and my husband was going through a divorce, she let me have some furniture. And she said she was going to note it on the book. Sometimes, I cleaned up for her and I paid for it and we just have, like, a little understanding about it. Okay. When she got killed, it was still on the book. And then her son-in-law — when I came back from Nevada, then that’s *1098 when I had to pay for it. I don’t remember when it was.
Q: So there was a dispute between you and her son-in-law?
A: No. It wasn’t a dispute. He just—
Q: Well, did you agree that you owed it?
A: Yes. We had no falling out about it. I had the funds, and I agreed I owed it. When I went to Nevada, I guess it was just a space where I owed ' him. When I came back here and went to work, I paid him for it. We never had a misunderstanding about it.
Q: If it wasn’t no misunderstanding, why did it have to go to court?
A: I’m not quite sure about that. I remember them bringing the papers after I come back here to go to work. Maybe he found out I was back or what. But then I went down to the store — that’s when they had moved the store over to where the other building was — and I talked to him about when I paid it. We never had a falling out about it.
Q: But you did have to be sued over it?
A: Yes. I can’t remember the—
Q: And there was a judgment against you?
A: Yes. But it was no falling-out about it.
Q: Is there anything about that, that would cause you any difficulty in that case?
A: No. Because he is a distributor for something for one of our salesman at Super Value where I work, and he come in every Thursday, and the lady make an order so I see him like on a weekly basis. But, you know, sometimes, I speak if it’s — because she see him like over in her office, so no, it’s nothing about that would make me have no — .
¶ 261. Similar to the State’s characterization of Wright’s litigation with Tardy’s discussed above, the State’s representation that Burnside’s wages were garnished and that Burnside “denied” this is unsupported by the record in today’s case. This incorrect description of the litigation between Burnside and Tardy’s is suspect. See Flowers III, 947 So.2d at 924 (citing Manning, 765 So.2d at 519) (“Lack of support in the record for the reason given for a peremptory strike has been identified as an indicator of pretext.”).

Burnside’s Relationships with Flowers and His Family

¶262. The State also cited Burnside’s relationships with Flowers and his family as a basis for its challenge. Burnside stated during voir dire that she used to live close to the Flowers family. Flowers and his sister, Prisilla, used to visit Burnside’s home. Further, Flowers was friends with Burnside’s sons and used to play football with them. Burnside stated that these relationships would not affect her ability to serve as a juror.
¶ 263. No white venire members had comparable — or even close to comparable — relationships with Flowers and his family. This Court has recognized that a juror’s relationships with the defendant’s family may provide a race-neutral reason for a peremptory challenge. See Manning, 735 So.2d at 340. And although Burnside stated that her connections to the Flowers family would not affect her when serving as a juror, this basis — standing alone — seems to not be pretext. As mentioned above, however, this race neutral basis does not negate the questionable characterization of Burnside’s litigation with Tardy’s. Batson, 476 U.S. at 96-97, 106 S.Ct. 1712; Miller-El, 545 U.S. at 239-40,125 S.Ct. 2317.

*1099
Burnside’s Statements Regarding the Death Penalty and Her Ability to Judge Others

¶264. The State’s final reasons for striking Burnside were her statements relating to whether she could judge another person and impose the death penalty. Burnside testified as follows during individual voir dire:
Q: .... And so I want to know if the facts justified it and the law allowed it, could you consider the death penalty as a sentencing possibility?
A: That I don’t think I could do. I don’t know if I could do that.... I don’t — I don’t know if I could consider it, sending anybody to death. I don’t know if I could do that.
Q: And can you explain further your views on that?
A: I’ve just never been put in that predicament. I’ve always just don’t know if I could do that. It’s just the best way I can explain it. I just don’t think I could do that.
Q: Again, let me explain. You’re not committing to’ do it or not to do it. You’re just — we just need to know if that’s something that would be in your mind where you could think about it and you could consider the possibility of it.
A: I could think about it and consider it. That’s all I could say.
Q: And would you consider the imposition of the death penalty, if you were on the jury and it got to the second phase?
A: If I was on there, yeah, I guess I’d have to.
Q: So if the facts justified it and the law allowed it, you would consider it?
A: Yes.
Q: Also, if he did not receive that death sentence — if he was convicted and the jury did not impose the death sentence, ... [he] would receive the sentence of life without parole. So is that a sentencing option that you could consider, also?
A: Yes, I could consider that.
Q: And so you would consider and have an open mind as to both sentencing options then; is that correct?
A: Yes, sir.
Although Burnside eventually stated that she would consider both sentencing options, she later stated in voir dire that her reservations about judging another person would affect her ability to serve as a juror:
Q: When I was asking the questions the other day about jurors that could judge other people, you stated at that time that you could not judge anyone. Why did you state that?
A: Well, because I — you know, I prefer not to judge anyone. But then when they come back and say could I be fair. My thing is I prefer not to judge anyone. But no, I will be fair.
Q: All right. Who will you be fair to?
A: I will be fair to whoever evidence is presented. I will be fair. Because I would want somebody to be fair to me or my children or my family. That the only way I can explain it.
[[Image here]]
Q: So you have changed your mind, and you say now that you could judge someone; is that correct?
A: Well, basically, I haven’t changed my mind. I just prefer not to. be in a predicament where I have to judge somebody.
Q: So you still have a problem with judging someone?
A: I still have a problem with that.
Q: Would that problem be such that you ' would think about it if you were picked on a jury?
A: Well, I’d have to say yes.
*1100 Q: It would? So that might affect your judgment in the case; is that right?
A: It could, possibly, yes, sir.
Flowers’s counsel then rehabilitated Burnside:
Q: Ms. Burnside, if you got picked on the jury, you would be fair to both sides, wouldn’t you?
A: Yes, sir.
Q: And despite the fact that you don’t like to judge, if you got picked you would, in fact, judge and be fair to both sides; is that correct?
A: Yes, sir, that is correct.
¶ 265. While a juror’s -views on the death penalty and hesitation about serving as a juror are race neutral reasons for peremptory challenges, the State rehabilitated Burnside and she ultimately stated that she could consider either punishment and could be fair to either side. See Batiste, 121 So.3d at 848; Hughes, 90 So.3d at 626; Flowers III, 947 So.2d at 920-21. As such, this basis is somewhat suspect.
D. Jury Selection Conclusion
¶ 266. While the Court has focused on the interests of Flowers in having a jury not tainted by racial bias, it has ignored the right of prospective jurors not to be subjected to racial bias. Beyond question, the right to a jury selection process free from the taint of racial discrimination belongs both to the parties and to the prospective jurors. See Powers v. Ohio, 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (Courts are “under an affirmative duty to enforce the ... policies embodied in [the] prohibition” on the discrimination in the selection of jurors.). When the trial court and this Court, in robotic fashion, merely say that the prosecution gave facially race neutral reasons, which were not rebutted by the defense, both completely disregard the constitutional right of prospective jurors to be free from a racially discriminatory selection process.
¶ 267. No attorneys are present in the courtroom to protect the constitutional rights of perspective jurors. Thus, of necessity, that responsibility must be undertaken by the trial courts. The honest exercise of that responsibility demands that the trial court look beyond the mere recitation of the words “race neutral.” In this case, the trial court completely ignored and failed in that responsibility.
III. Conclusion
¶ 268. As noted previously, this case has been twice reversed by this Court for some of the same issues presented to it today. In the retrial of a case under these circumstances, where the same issues are confronted, the trial court is obligated to look beyond the surface. The trial court failed in that obligation.
¶ 269. Because of that failure, I cannot conclude that Flowers received a fair trial, nor can I conclude that prospective jurors were not subjected to impermissible discrimination. For these reasons, I would reverse and remand for a new trial.
DICKINSON, P.J., AND KITCHENS, J., JOIN THIS OPINION.

APPENDIX

DEATH CASES AFFIRMED BY THIS COURT

Caleb Corrothers v. State, 148 So.3d 278 (Miss.2014).
Jason Lee Keller v. State, 138 So.3d 817 (Miss.2014).
Leslie Galloway III v. State, 122 So.3d 614 (Miss.2013),
Bobby Batiste v. State, 121 So.3d 808 (Miss.2013).
Roger Lee Gillett v. State, 56 So.3d 469 (Miss.2010).
*1101 Moffett v. State, 49 So.3d 1073 (Miss.2010).
Pitchford v. State, 45 So.3d 216 (Miss.2010).
Goff v. State, 14 So.3d 625 (Miss.2009).
Wilson v. State, 21 So.3d 572 (Miss.2009).
Chamberlin v. State, 989 So.2d 320 (Miss.2008).
Loden v. State, 971 So.2d 548 (Miss.2007).
King v. State, 960 So.2d 413 (Miss.2007).
Bennett v. State, 933 So.2d 930 (Miss.2006).
Havard v. State, 928 So.2d 771 (Miss.2006).
Spicer v. State, 921 So.2d 292 (Miss.2006).
Hodges v. State, 912 So.2d 730 (Miss.2005).
Walker v. State, 913 So.2d 198 (Miss.2005).
Le v. State, 913 So.2d 913 (Miss.2005).
Brown v. State, 890 So.2d 901 (Miss.2004).
Powers v. State, 883 So.2d 20 (Miss.2004)
Branch v. State, 882 So.2d 36 (Miss.2004).
Scott v. State, 878 So.2d 933 (Miss.2004).
Lynch v. State, 877 So.2d 1254 (Miss.2004).
Dycus v. State, 875 So.2d 140 (Miss.2004).
Byrom v. State, 863 So.2d 836 (Miss.2003).
Howell v. State, 860 So.2d 704 (Miss.2003).
Howard v. State, 853 So.2d 781 (Miss.2003).
Walker v. State, 815 So.2d 1209 (Miss.2002). *following remand.
Bishop v. State, 812 So.2d 934 (Miss.2002).
Stevens v. State, 806 So.2d 1031 (Miss.2002).
Grayson v. State, 806 So.2d 241 (Miss.2002).
Knox v. State, 805 So.2d 527 (Miss.2002).
Simmons v. State, 805 So.2d 452 (Miss.2002).
Berry v. State, 802 So.2d 1033 (Miss.2001).
Snow v. State, 800 So.2d 472 (Miss.2001).
Mitchell v. State, 792 So.2d 192 (Miss.2001).
Puckett v. State, 788 So.2d 752 (Miss.2001). *following remand.
Goodin v. State, 787 So.2d 639 (Miss.2001).
Jordan v. State, 786 So.2d 987 (Miss.2001).
Manning v. State, 765 So.2d 516 (Miss.2000). *following remand.
Eskridge v. State, 765 So.2d 508 (Miss.2000).
McGilberry v. State, 741 So.2d 894 (Miss.1999).
Puckett v. State, 737 So.2d 322 (Miss.1999). *remanded for Batson hearing.
Manning v. State, 735 So.2d 323 (Miss.1999). *remanded for Batson hearing.
Hughes v. State, 735 So.2d 238 (Miss.1999).
Turner v. State, 732 So.2d 937 (Miss.1999).
Smith v. State, 729 So.2d 1191 (Miss.1998).
Burns v. State, 729 So.2d 203 (Miss.1998).
*1102 Jordan v. State, 728 So.2d 1088 (Miss.1998).
Gray v. State, 728 So.2d 36 (Miss.1998).
Manning v. State, 726 So.2d 1152 (Miss.1998).
Woodward v. State, 726 So.2d 524 (Miss.1997).
Bell v. State, 725 So.2d 836 (Miss.1998).
Evans v. State, 725 So.2d 613 (Miss.1997).
Brewer v. State, 725 So.2d 106 (Miss.1998).
Crawford v. State, 716 So.2d 1028 (Miss.1998).
Doss v. State, 709 So.2d 369 (Miss.1996).
Underwood v. State, 708 So.2d 18 (Miss.1998).
Holland v. State, 705 So.2d 307 (Miss.1997).
Wells v. State, 698 So.2d 497 (Miss.1997).
Wilcher v. State, 697 So.2d 1087 (Miss.1997).
Wiley v. State, 691 So.2d 959 (Miss.1997).
Brown v. State, 690 So.2d 276 (Miss.1996).
Simon v. State, 688 So.2d 791 (Miss.1997).
Jackson v. State, 684 So.2d 1213 (Miss.1996).
Williams v. State, 684 So.2d 1179 (Miss.1996).
Davis v. State, 684 So.2d 643 (Miss.1996).
Taylor v. State, 682 So.2d 359 (Miss.1996).
Brown v. State, 682 So.2d 340 (Miss.1996).
Blue v. State, 674 So.2d 1184 (Miss.1996).
Holly v. State, 671 So.2d 32 (Miss.1996).
Walker v. State, 671 So.2d 581 (Miss.1995).
Russell v. State, 670 So.2d 816 (Miss.1995).
Ballenger v. State, 667 So.2d 1242 (Miss.1995).
Davis v. State, 660 So.2d 1228 (Miss.1995).
Carr v. State, 655 So.2d 824 (Miss.1995).
Mack v. State, 650 So.2d 1289 (Miss.1994).
Chase v. State, 645 So.2d 829 (Miss.1994).
Foster v. State, 639 So.2d 1263 (Miss.1994).
Conner v. State, 632 So.2d 1239 (Miss.1993).
Hansen v. State, 592 So.2d 114 (Miss.1991).
* Shell v. State, 554 So.2d 887 (Miss.1989); Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding; Shell v. State, 595 So.2d 1323 (Miss.1992) remanding for new sentencing hearing.
Davis v. State, 551 So.2d 165 (Miss.1989).
Minnick v. State, 551 So.2d 77 (Miss.1989).
* Pinkney v. State, 538 So.2d 329 (Miss.1989); Pinkney v. Mississippi, 494 U.S. 1075, 11() S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding; Pinkney v. State, 602 So.2d 1177 (Miss.1992) remanding for new sentencing hearing.
*1103 * Clemons v. State, 535 So.2d 1354 (Miss.1988); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding; Clemons v. State, 593 So.2d 1004 (Miss.1992) remanding for new sentencing hearing.
Woodward v. State, 533 So.2d 418 (Miss.1988).
Nixon v. State, 533 So.2d 1078 (Miss.1987).
Cole v. State, 525 So.2d 365 (Miss.1987).
Lockett v. State, 517 So.2d 1346 (Miss.1987).
Lockett v. State, 517 So.2d 1317 (Miss.1987).
Faraga v. State, 514 So.2d 295 (Miss.1987).
* Jones v. State, 517 So.2d 1295 (Miss.1987); Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding; Jones v. State, 602 So.2d 1170 (Miss.1992) remanding for new sentencing hearing.
Wiley v. State, 484 So.2d 339 (Miss.1986).
Johnson v. State, 477 So.2d 196 (Miss.1985).
Gray v. State, 472 So.2d 409 (Miss.1985).
Cabello v. State, 471 So.2d 332 (Miss.1985).
Jordan v. State, 464 So.2d 475 (Miss.1985).
Wilcher v. State, 455 So.2d 727 (Miss.1984).
Billiot v. State, 454 So.2d 445 (Miss.1984).
Stringer v. State, 454 So.2d 468 (Miss.1984).
Dufour v. State, 453 So.2d 337 (Miss.1984).
Neal v. State, 451 So.2d 743 (Miss.1984).
Booker v. State, 449 So.2d 209 (Miss.1984).
Wilcher v. State, 448 So.2d 927 (Miss.1984).
Caldwell v. State, 443 So.2d 806 (Miss.1983).
Irving v. State, 441 So.2d 846 (Miss.1983).
Tokman v. State, 435 So.2d 664 (Miss.1983).
Leatherwood v. State, 435 So.2d 645 (Miss.1983).
Hill v. State, 432 So.2d 427 (Miss.1983).
Pruett v. State, 431 So.2d 1101 (Miss.1983).
Gilliard v. State, 428 So.2d 576 (Miss.1983).
Evans v. State, 422 So.2d 737 (Miss.1982).
King v. State, 421 So.2d 1009 (Miss.1982).
Wheat v. State, 420 So.2d 229 (Miss.1982).
Smith v. State, 419 So.2d 563 (Miss.1982).
Johnson v. State, 416 So.2d 383 (Miss.1982).
Edwards v. State, 413 So.2d 1007 (Miss.1982).
Bullock v. State, 391 So.2d 601 (Miss.1980).
Reddix v. State, 381 So.2d 999 (Miss.1980).
Jones v. State, 381 So.2d 983 (Miss.1980).
Culberson v. State, 379 So.2d 499 (Miss.1979).
Gray v. State, 375 So.2d 994 (Miss.1979).
Jordan v. State, 365 So.2d 1198 (Miss.1978).
*1104 Voyles v. State, 362 So.2d 1236 (Miss.1978).
Irving v. State, 361 So.2d 1360 (Miss.1978).
Washington v. State, 361 So.2d 61 (Miss.1978).
Bell v. State, 360 So.2d 1206 (Miss.1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCING PHASE

Byrom v. State, 2014-DR-00230-SCT (April 3, 2014) (order).
Ross v. State, 954 So.2d 968 (Miss.2007).
Flowers v. State, 947 So.2d 910 (Miss.2007).
Flowers v. State, 842 So.2d 531 (Miss.2003).
Randall v. State, 806 So.2d 185 (Miss.2002).
Flowers v. State, 773 So.2d 309 (Miss.2000).
Edwards v. State, 737 So.2d 275 (Miss.1999).
Smith v. State, 733 So.2d 793 (Miss.1999).
Porter v. State, 732 So.2d 899 (Miss.1999).
Kolberg v. State, 704 So.2d 1307 (Miss.1997).
Snelson v. State, 704 So.2d 452 (Miss.1997).
Fuselier v. State, 702 So.2d 388 (Miss.1997).
Howard v. State, 701 So.2d 274 (Miss.1997).
Lester v. State, 692 So.2d 755 (Miss.1997).
Hunter v. State, 684 So.2d 625 (Miss.1996).
Lanier v. State, 684 So.2d 93 (Miss.1996).
Giles v. State, 650 So.2d 846 (Miss.1995).
Duplantis v. State, 644 So.2d 1235 (Miss.1994).
Harrison v. State, 635 So.2d 894 (Miss.1994).
Butler v. State, 608 So.2d 314 (Miss.1992).
Jenkins v. State, 607 So.2d 1171 (Miss.1992).
Abram v. State, 606 So.2d 1015 (Miss.1992).
Balfour v. State, 598 So.2d 731 (Miss.1992).
Griffin v. State, 557 So.2d 542 (Miss.1990).
Bevill v. State, 556 So.2d 699 (Miss.1990).
West v. State, 553 So.2d 8 (Miss.1989).
Leatherwood v. State, 548 So.2d 389 (Miss.1989).
Mease v. State, 539 So.2d 1324 (Miss.1989).
Houston v. State, 531 So.2d 598 (Miss.1988).
West v. State, 519 So.2d 418 (Miss.1988).
Davis v. State, 512 So.2d 1291 (Miss.1987).
Williamson v. State, 512 So.2d 868 (Miss.1987).
Foster v. State, 508 So.2d 1111 (Miss.1987).
Smith v. State, 499 So.2d 750 (Miss.1986).
West v. State, 485 So.2d 681 (Miss.1985).
Fisher v. State, 481 So.2d 203 (Miss.1985).
Johnson v. State, 476 So.2d 1195 (Miss.1985).
Fuselier v. State, 468 So.2d 45 (Miss.1985).
*1105 West v. State, 463 So.2d 1048 (Miss.1985).
Jones v. State, 461 So.2d 686 (Miss.1984).
Moffett v. State, 456 So.2d 714 (Miss.1984).
Lanier v. State, 450 So.2d 69 (Miss.1984).
Laney v. State, 421 So.2d 1216 (Miss.1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT

Reddix v. State, 547 So.2d 792 (Miss.1989).
Wheeler v. State, 536 So.2d 1341 (Miss.1988).
White v. State, 532 So.2d 1207 (Miss.1988).
Bullock v. State, 525 So.2d 764 (Miss.1987).
Edwards v. State, 441 So.2d 84 (Miss.1983).
Dycus v. State, 440 So.2d 246 (Miss.1983).
Coleman v. State, 378 So.2d 640 (Miss.1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY

Fulgham v. State, 46 So.3d 315 (Miss.2010).
Rubenstein v. State, 941 So.2d 735 (Miss.2006).
King v. State, 784 So.2d 884 (Miss.2001).
Walker v. State, 740 So.2d 873 (Miss.1999).
Watts v. State, 733 So.2d 214 (Miss.1999).
West v. State, 725 So.2d 872 (Miss.1998).
Smith v. State, 724 So.2d 280 (Miss.1998).
Berry v. State, 703 So.2d 269 (Miss.1997).
Booker v. State, 699 So.2d 132 (Miss.1997).
Taylor v. State, 672 So.2d 1246 (Miss.1996).
* Shell v. State, 554 So.2d 887 (Miss.1989); Shell v. Mississippi 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding; Shell v. State 595 So.2d 1323 (Miss.1992) remanding for new sentencing hearing.
* Pinkney v. State, 538 So.2d 329 (Miss.1989); Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding; Pinkney v. State, 602 So.2d 1177 (Miss.1992) remanding for new sentencing hearing.
* Clemons v. State, 535 So.2d 1354 (Miss.1988); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding; Clemons v. State, 593 So.2d 1004 (Miss.1992) remanding for new sentencing hearing.
* Jones v. State, 517 So.2d 1295 (Miss. 1987); Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding; Jones v. State, 602 So.2d 1170 (Miss.1992) remanding for new sentencing hearing.
Russell v. State, 607 So.2d 1107 (Miss.1992).
Holland v. State, 587 So.2d 848 (Miss.1991).
Willie v. State, 585 So.2d 660 (Miss.1991).
Ladner v. State, 584 So.2d 743 (Miss.1991).
Mackbee v. State, 575 So.2d 16 (Miss.1990).
*1106 Berry v. State, 575 So.2d 1 (Miss.1990).
Turner v. State, 573 So.2d 657 (Miss.1990).
State v. Tokman, 564 So.2d 1389 (Miss.1990).
Johnson v. State, 547 So.2d 59 (Miss.1989).
Williams v. State, 544 So.2d 782 (Miss.1989); sentence aff'd 684 So.2d 1179 (1996).
Lanier v. State, 533 So.2d 473 (Miss.1988).
Stringer v. State, 500 So.2d 928 (Miss.1986).
Pinkton v. State, 481 So.2d 306 (Miss.1985).
Mhoon v. State, 464 So.2d 77 (Miss.1985).
Cannaday v. State, 455 So.2d 713 (Miss.1984).
Wiley v. State, 449 So.2d 756 (Miss.1984); resentencing affirmed, Wiley v. State, 484 So.2d 339 (Miss.1986); cert, denied, Wiley v. Mississippi, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 610 (1988); resentencing ordered, Wiley v. State, 635 So.2d 802 (Miss.1993) following writ of ha-beas corpus issued pursuant to Wiley v. Puckett, 969 F.2d 86, 105-106 (5th Cir. 1992); resentencing affirmed.
Williams v. State, 445 So.2d 798 (Miss.1984). *Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.
(Revised November 10, 2014).

. Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. The record does not indicate whether Cunningham was nodding in the affirmative or the negative.

 Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.